1   MICHAEL D. BRESLAUER [SBN 110259]
    mbreslauer@swsslaw.com
2   SOLOMON WARD SEIDENWURM & SMITH, LLP
    401 B Street, Suite 1200
3   San Diego, California 92101
    Telephone (619) 231-0303
4   Facsimile (619) 231-4755

5   Attorneys for Creditor SunBrewer Partners,
    L.P.

6

7                    UNITED STATES BANKRUPTCY COURT

8                    SOUTHERN DISTRICT OF CALIFORNIA

9   In re                              Case No. 21-01913-LT7

10  SYDNEY L. NGUYEN and YUMI          **OPPOSITION TO DEBTORS'**
    BUI,                               **EMERGENCY APPLICATION FOR**
11                                     **AN ORDER ALLOWING DEBTORS**
                                       **TO CONTINUE OPERATING THEIR**
12         Debtors.                    **BUSINESS PENDING THE**
                                       **BAKNRUPTCY ADMINISTRATION;**
13                                     **JOINDER IN TRUSTEE'S**
                                       **OPPOSTION; DECLARATION OF**
14                                     **ROBERTA DEGENER**

15

16                                     Date: May 27, 2021
                                       Time: 10:00 am
17                                     Dept: Three (3)

18                                     Honorable Laura S. Taylor

19

20         Creditor and real property lessor Sunbrewer Partners, L.P. ("SunBrewer")

21  submits its Opposition to Debtors' SYDNEY L. NGUYEN and YUMI BUI

22  ("Debtors") Emergency Application for an Order allowing Debtors to Continue

23  Operating their Business Pending the Bankruptcy Administration as follows.

24

25

26

27

28

**Facts and Status of the Lease.**[1] SunBrewer is the lessor and the Debtors - individually - are tenants under a written lease dated as of April 1, 2011 (the "Lease") for the real property described as Suite G-1, 9975 Carmel Mountain Road, San Diego California in the Plaza Rancho Penasquitos shopping center. Under a First Amendment to the Lease dated August 28, 2018, among other changes, the term of the Lease was extended through January 31, 2024. Current monthly minimum rent under the Lease is $5,633.11. The Debtors operate the business, La Jolla Noodles, as a sole proprietorship.

Prior to the Chapter 7 filing, the Lease was in default. Through May 2021, a total of $48,691.38 is owed for past due rent, common area charges, taxes and insurance. The Lease is not listed in the Debtors' schedules and statement of financial affairs, but SunBrewer did receive notice of the Chapter 7 filing.

This is not the Debtors' first bankruptcy case in this district. In 2017, they filed a Chapter 13 case (17-03520). Within the Chapter 13 case, also filed for the Debtors by Mr. Winfree, the Chapter 13 Trustee objected to confirmation and urged that the case be dismissed. Case No 17- 03520-LT13; Dkt. No. 36) Among the grounds is an assertion that creditors would be getting less under a plan than they would under a Chapter 7 case. The Debtors' chapter 13 plan was confirmed, but the Trustee moved to dismiss the case following the Debtors' default in payments under the Plan. Dkt. No. 86. The Debtors did not oppose dismissal and the chapter 13 case was dismissed on April 8, 2021. This chapter 7 case was filed less than a month later.

Finally, in both the Debtors' most recent bankruptcy cases the SunBrewer Lease is not listed in the Debtors' schedules and the monthly lease payments ($4,713.07 at the time of the Chapter 13 in 2017 filing and $5,633.11 at the time of

---

[1] The facts are supported by the Declaration of Roberta Degener, filed concurrently herewith, and the files of the Debtors' Chapter 7 case and their 2017 Chapter 13 case.

1    this chapter 7 filing) are not listed among the Debtors' monthly expenses.

2    **The Debtor's Emergency Motion Should Be Denied**.

3    The Debtors chose Chapter 7 relief by filing their bare-bones petition on May

4    4, 2021, ostensibly continued to operate their business, and then filed their

5    "emergency" motion on May 20, 2021. But the Debtors' schedules filed May 18,

6    2021, fail to accurately account for the operation of their business. There is no

7    listing of their Lease with Sunbrewer on Schedule G, and the description of their

8    personal monthly income and expenses fails to account for the operation of their

9    business. The Court, the Trustee and creditors are in the dark about how much the

10    Debtors' income and expenses are.

11    Against this backdrop, the Debtors wish to enjoy the benefits of bankruptcy

12    with the automatic stay and the potential discharge of personal indebtedness. But the

13    Debtors want to enjoy these benefits while continuing to consume creditors' (here,

14    Sunbrewer's) assets without payment of rent and while possessing neither the legal

15    ability to "assume" the Lease in this Chapter 7 case, nor the factual ability to cure

16    the defaults under the Lease.

17    The filing of a Chapter 7 case poses insurmountable hurdles to the Debtors

18    with respect to the Lease. The Debtors have no legal means to assume the Lease, a

19    right possessed exclusively by the Chapter 7 trustee. Bankruptcy Code Section

20    365(a). If a lease is rejected, there is no statutory means for its 'resurrection' and

21    rejection would constitute a material breach of the lease which could thereafter be

22    'cured'. Section 365(g). Until the Lease is rejected, the Trustee is obligated to

23    perform its terms Section 365(d)(3). Following an abandonment under section 554,

24    the abandoned property would no longer be property of the bankruptcy estate and

25    would revert to the debtor. See *In re Dewsnup*, 908 F.2d 588, 590 (10th Cir. 1990),

26    aff'd 502 U.S. 410 (1992).

27

28

Accordingly, the Debtors request seems to be implicitly acknowledging that the Trustee will "very likely" abandon the Lease. Thus, they implicitly ask in their Emergency Motion, "what's the harm in their continuing to operate the business and derive post-petition revenue and income"? Plenty. Their continued operations expose the estate to liabilities and risk while consuming SunBrewer's asset without compensation in the process. It's simply wrong and the Court ought not allow the Debtors' to enjoy such a result.

The Trustee's opposition to the Emergency Motion[2] notes the legal impediment posed by the Bankruptcy Appellate Panel's decision in *Nakhuda v. Mansdorf*, 2015 Bankr. Lexis 649 (Bankr. 9th Cir. 2015). The Panel there held that a Chapter 7 debtor is required by statute to cease operations upon the filing of a Chapter 7 petition because continued operations are "absolutely inconsistent" with the affirmative duty imposed upon the debtor to turn over the assets of the estate to the trustee under Section 521(a)(4). This, the Court implied, was a 'black and white' conclusion, and is one presumably unaffected by the Debtors' failure, as here, to list the Lease and the business operations in their schedules.

Thus, there is no authority, and the Debtors' offer none, for their continued operations of their business during the pendency of the Chapter 7 case. This is true even if it might appear doubtful that the Trustee will assume the lease or, as appears more likely, that he will either allow rejection to occur with the passage of time or will abandon the Lease. But if the Court is considering a hybridized remedy here, somehow expediting abandonment as a means of granting the Debtors' motion, fundamental fairness would require that the Debtors' as a condition to any such relief (i) pay all post-petition rent under the Lease and (ii) stipulate to a termination of the automatic stay with respect to all acts undertaken by SunBrewer to obtain possession of the premises and terminate the lease under applicable law.

---

[2] SunBrewer hereby joins in the Trustee's opposition to the Emergency Motion (Dkt. No. 16).

1      Finally, as the Trustee has noted in his opposition, the Debtors' motion for

2  emergency relief is woefully deficient. In addition to the items mentioned in the

3  Trustee's opposition is the added failure to notify SunBrewer or it's counsel (the

4  only materially affected party other than the Trustee) that the Emergency motion

5  had been filed and to seek whether SunBrewer opposed relief, and to communicate

6  that information to the Court in a declaration filed to support relief. See Bankruptcy

7  Local Rules 9013-9(d) and (e). The Debtors' failure to follow well established and

8  unambiguous rules should be taken into account as the Court reviews their request.

9      The Debtors' emergency motion is both procedurally and substantively

10  deficient and should be denied.

11

12  DATED:  May 25, 2021       SOLOMON WARD SEIDENWURM & SMITH, LLP

13

14                              By: /s/ Michael D. Breslauer

15                                  MICHAEL D. BRESLAUER

16                                  Attorneys for Creditor SunBrewer Partners, L.P.

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF ROBERTA DEGENER

I, ROBERTA DEGENER, declare:

1.     I am over 18 years of age and am the President of 1st Commercial Management Group, real property manager and agent for SunBrewer Partners, L.P., a California partnership ("SunBrewer"), the owner of a shopping center known as the Plaza Rancho Penasquitos. I have personal knowledge of the facts set forth in this declaration either from my own knowledge or from review of information collected and maintained in the ordinary course of business at 1st Commercial Management Group as agent and manager for SunBrewer and could and would testify thereto if called as witness in this matter.

2.     SunBrewer is landlord and Sydney L. Nguyen and Yumi Bui (the "Debtors") are tenants under a written lease dated April 1, 2011 for the real property premises located at 9975 Carmel Mountain Road, Suite G-1, San Diego, California 92129 (the "Premises"). A true and correct copy of the Lease is attached hereto as Exhibit A.

3.     On August 28, 2018, the Lease was amended by that certain First Amendment to Lease between SunBrewer and the Debtors. A true and correct copy of the First Amendment is attached hereto as Exhibit B.

4.     Attached hereto as Exhibit C is a Tenant Ledger Summary Report dated May 14, 2021 for the Debtors' lease of the Premises under the Lease. It identifies rent and other charges and payments under the Lease for the period from January 2020 through May 2021. As shown on the summary, the Lease is currently in default and the Debtors owe the sum $48,691.38 under the Lease.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and was executed this 25th day of May 2021 at San Diego, California.

/s/ Roberta Degener
ROBERTA DEGENER

# EXHIBIT A

**STANDARD COMMERCIAL RETAIL LEASE**
**(Plaza Rancho Penasquitos)**

**BETWEEN**

**SunBrewer Partners, L.P.,**
**a California limited partnership**

**AS LANDLORD**

**AND**

**SYDNEY NGUYEN AND YUMI BUI,**
**husband and wife**

**d/b/a/**

**Saigon Noodles**

**AS TENANT**

DATE: _____4/1/_____, 2011

EXHIBIT A

**TABLE OF CONTENTS**

**Page**

ARTICLE 1     LEASE OF PREMISES ......................................................................................1

ARTICLE 2     BASIC LEASE PROVISIONS.............................................................................1

ARTICLE 3     RENT .................................................................................................................1

ARTICLE 4     TERM.................................................................................................................4

ARTICLE 5     SECURITY DEPOSIT.......................................................................................5

ARTICLE 6     PAYMENT UPON EXECUTION........................................................................6

ARTICLE 7     OPERATION OF BUSINESS BY TENANT ......................................................6

ARTICLE 8     PARKING AND COMMON AREA .....................................................................7

ARTICLE 9     ALTERATIONS BY LANDLORD .......................................................................7

ARTICLE 10    ALTERATIONS BY TENANT ............................................................................7

ARTICLE 11    MECHANIC'S LIENS ........................................................................................8

ARTICLE 12    INSURANCE AND INDEMNITY .......................................................................9

ARTICLE 13    TAXES .............................................................................................................10

ARTICLE 14    UTILITIES ........................................................................................................10

ARTICLE 15    MAINTENANCE OF THE PREMISES .............................................................11

ARTICLE 16    ESTOPPEL STATEMENT, SUBORDINATION AND ATTORNMENT............12

ARTICLE 17    ASSIGNMENT AND SUBLETTING .................................................................13

ARTICLE 18    ADVERTISING AND PROMOTION FUND ......................................................16

ARTICLE 19    DESTRUCTION OF PREMISES ......................................................................17

ARTICLE 20    EMINENT DOMAIN .........................................................................................18

ARTICLE 21    DEFAULT .........................................................................................................19

ARTICLE 22    REMEDIES IN DEFAULT.................................................................................19

ARTICLE 23    BANKRUPTCY OR INSOLVENCY ..................................................................20

ARTICLE 24    ACCESS BY LANDLORD ................................................................................20

ARTICLE 25    HOLDING OVER ..............................................................................................21

ARTICLE 26    QUIET ENJOYMENT .......................................................................................21

ARTICLE 27    MISCELLANEOUS ..........................................................................................21

EXHIBIT A

## STANDARD COMMERCIAL RETAIL LEASE

THIS LEASE ("**Lease**") is made and entered into this ____ day of March, 2011 between *SunBrewer Partners, L.P., a California limited partnership* ("**Landlord**") and *Sydney Nguyen and Yumi Bui, husband and wife, dba Saigon Noodles* ("**Tenant**").

ARTICLE 1
LEASE OF PREMISES

In consideration of the rents and the terms, conditions and covenants hereinafter set forth, Landlord hereby leases to Tenant and Tenant hereby hires from Landlord, for the term, at the rental and on the terms, conditions and covenants hereinafter set forth, certain commercial premises (the "**Premises**") generally described in Article 2.1 below and more particularly described on Exhibit A, (Site Plan), attached hereto and incorporated herein by this reference. Landlord and Tenant hereby agree to do, keep and perform each and all of the terms, covenants and conditions described herein to be so done, kept and performed, respectively, by each of them.

ARTICLE 2
BASIC LEASE PROVISIONS

2.1    **Description of Premises** (Article 1):   The Premises shall consist of a space of approximately one thousand six hundred seventy-five (1,675) square feet located in that certain shopping center (the "**Shopping Center**") more particularly described on Exhibit A, (Site Plan).   The address of the Premises is: 9975 Carmel Mountain Road, Suite G-1, San Diego, California 92129.

2.2    **Minimum Rent** (Article 3.1): Four Thousand One Hundred Eighty-Seven and 50/100 Dollars ($4,187.50) per month.  (See Addendum to Lease).

2.3    **Percentage Rent Multiplier** (Article 3.2): 6%.

2.4    **Lease Term (Article 4)**: The term of this Lease ("**Term**") shall commence at 12:01 a.m. on the date ("**Commencement Date**") that is ninety (90) days after the full execution and delivery of this Lease, and shall end at 12:00 p.m. PST on the date which is ninety (90) months following the Commencement Date; provided, however, if the Commencement Date falls on a day other than the first day of a calendar month, then such ninety (90) month period shall be measured from the first day of the month following the month in which the Commencement Date falls.

2.5    **Security Deposit** (Article 5): Five Thousand Four Hundred Ninety-Four and 00/100 Dollars ($5,494.00).

2.6    **Permitted Use of the Premises** (Article 7.1): Tenant shall use the Premises solely for the operation of a Vietnamese restaurant and for no other purpose.

2.7    **Permitted Trade Name** (Article 7.1): Saigon Noodles.

2.8    **Minimum Rent Adjustment Date** (Article 3.1b): Three percent (3%) each year during the Term of the Lease. (See Addendum to Lease).

2.9    **Tenant's Estimated Pro Rata Share of the Shopping Center** (Article 3.3f): 1.18%.

2.10    **Advertising and Promotion Fund** (Article 18): Thirty-Three and 50/100 Dollars ($33.50) per month or ($.02) per square foot per month (subject to Article 18).

2.11    **Notices**:   (Article 27.8)

To Tenant:      At the Premises

To Landlord:    SunBrewer Partners, L.P., c/o West Coast Retail Management
                Inc., 9888 Carmel Mountain Road, Suite I San Diego, CA 92129

2.12    **Exhibits**: (Article 28.28)
         Addendum to Lease
         A.      Site Plan
         B.      Tenant Improvement Agreement
         B-1     Landlord Work
         C.      Sign Criteria
         D.      Rules & Regulations
         E.      Confirmation of Lease Terms

ARTICLE 3
RENT

3.1    **Minimum Rent**

EXHIBIT A

(a)     Tenant agrees to pay to Landlord as minimum rent ("**Minimum Rent**") during the Term of this Lease the sum set forth in Article 2.2 hereof.  Each payment of Minimum Rent shall be paid on, or before the first day of the calendar month to which it pertains, in advance, and without deduction, abatement (except as specifically provided to the contrary herein), setoff, prior notice or demand of any kind. Minimum Rent shall be paid monthly and shall be prorated as provided in Article 3.5 hereof for any partial month during the Term hereof. The obligation to pay Minimum Rent shall commence on the Commencement Date.

The Minimum Rent shall be subject to an annual adjustment as set forth in the Addendum to Lease.

3.2     **Percentage Rent**

(a)     In addition to the Minimum Rent to be paid by Tenant pursuant to Article 3.1, Tenant agrees to pay to Landlord at the time and in the manner herein specified additional rent in an amount equal to the amount by which the product of the "Gross Sales" made in, upon or from the Premises during each calendar month of the Term of this Lease multiplied by the Percentage Rent Multiplier set forth in Article 2.3 hereof) exceeds the amount of Minimum Rent due from Tenant for such calendar month (the "**Percentage Rent**").

(b)     The term "**Gross Sales**" means the gross selling price of all merchandise or services sold in or from the Premises whether or not collected at all, by Tenant, or its subtenants, licensees and concessionaires, whether for cash or credit (irrespective of whether title passes by delivery), and whether made by store personnel, concession personnel or by vending machines, excluding therefrom only the following:

(i)     The discounts, allowances, refunds or credits for merchandise which was purchased at the Premises and returned by customers;

(ii)     Goods returned to sources or transferred to another store or warehouse owned by or affiliated with Tenant;

(iii)     Sums and credits received in settlement of claims for lost or damaged merchandise;

(iv)     The price allowed on all merchandise traded in by customers for credit or the amount of credit for discounts and allowances made in lieu of acceptance thereof;

(v)     Interest, service or sales carrying charges, or other charges, however denominated, paid by customers for extension of credit on sales, which were not included in the sales price;

(vi)     Receipts from public telephones or stamp machines;

(vii)     Gift certificates or vouchers until such time as the same are converted into a sale by redemption;

(viii)     The amount of any sales, use, luxury or gross receipts tax now or hereafter imposed upon the sale of merchandise or services, but only if collected separately from the selling price of merchandise or services and collected from customers;

(ix)     Sales of fixtures, equipment or property which are not stock in trade.

(c)     Within thirty (30) days after the end of each calendar month during the Term hereof, Tenant shall furnish to Landlord a statement in writing, certified by Tenant to be correct, showing the total Gross Sales made in, upon, or from the Premises during such preceding calendar month, and shall accompany each such statement with a payment to Landlord of Percentage Rent in an amount equal to the amount by which the product of the total Gross Sales for such preceding calendar month multiplied by the Percentage Rent Multiplier exceeds the Minimum Rent paid by Tenant for such preceding calendar month.  The Percentage Rent due for any partial calendar month during the Term hereof shall be prorated as provided for in Article 3.5 hereof.  Within sixty (60) days after the end of each calendar year of the Term hereof, Tenant shall furnish to Landlord a statement in writing, certified by Tenant to be correct, showing the total Gross Sales by month made in, upon, or from the Premises during each calendar year of the Term hereof, less the total Minimum Rent paid pursuant to Article 3.1 for each such calendar year, thereby confirming the correctness of the monthly statements delivered by Tenant to Landlord for such calendar year.  If the annual statement shows discrepancies from the collective monthly statements and if the annual statement is accepted and approved by Landlord as correct then adjustments to compensate for such discrepancies shall be made as provided in Article 3.2(d) below.

(d)     Tenant shall keep full, complete and proper books, records of account and supporting documents of its daily Gross Sales, both for cash and on credit, and shall keep or cause to be kept same for any separate departments.  Landlord and its agents, representatives and employees shall have the right at any and all times, during the regular business hours, to examine and inspect all of the books, records of account and supporting documents, including any sales tax reports pertaining to the

EXHIBIT A

business conducted in, upon or from the Premises, for any reasonable business purpose.  Landlord may at any time cause an audit of the business of Tenant to be made by an accountant of Landlord's selection and if any statement of Gross Sales previously made to Landlord by Tenant shall be found to be inaccurate, then and in that event, there shall be an adjustment and if Tenant is to be charged for not having paid the full amount of Percentage Rent shown to be due by such audit then Tenant shall pay to Landlord, on demand, such sums as may be necessary to settle in full the accurate amount of said Percentage Rent that should have been paid for the period or periods covered by such inaccurate statements.  If Landlord is to be charged because Tenant overpaid the Percentage Rent shown to be due by such audit then Tenant may deduct such amounts from the next payments of rent due hereunder, provided, however, if such adjustment occurs after the end of the Term hereof, Landlord shall, if Tenant is not in default hereunder, pay such amount to Tenant upon demand.  Tenant shall keep records of all such statements and all books, records of account and supporting documents based upon which daily, monthly and annual Gross Sales have been calculated for three (3) full years after the end of each calendar year to which they apply.  If said audit shall disclose an inaccuracy to be charged against Tenant greater than a two percent (2%) error with respect to the amount of Gross Sales reported by Tenant for the period of said report, then Tenant shall immediately pay to Landlord the cost of such audit; otherwise, the cost of such audit shall be paid by Landlord.  If such audit shall disclose any willful or substantial inaccuracies, such shall constitute a material breach of this Lease and this Lease may thereupon be canceled and terminated at the option of Landlord.

### 3.3    Additional Charges

(a)    In addition to the Minimum Rent and Percentage Rent to be paid by Tenant pursuant to Article 3.1 and Article 3.2, respectively, Tenant agrees to Pay to Landlord as additional rent during the Term of this Lease, Tenant's "Pro Rata Share," as defined herein, of all amounts designated herein as Tax Expenses, Insurance Expenses, and Operating Expenses incurred by Landlord (the "**Additional Charges**").  Additional Charges shall be paid monthly along with the payment of Minimum Rent, and shall be prorated as provided in Article 3.5 hereof for any partial month during the Term hereof.  The obligation to pay Additional Charges shall commence on the Commencement Date.

(b)    The term "**Tax Expenses**" shall mean and include all real estate, personal property and ad valorem taxes, assessments and other governmental charges or imposition, general and specific, ordinary and extraordinary, of any kind and nature whatsoever, and any increases and adjustments thereof, including but not limited to sewer or water charges, permit fees, transfer taxes, substitute taxes, assessments for public improvements or benefits, during the term hereof levied, assessed, imposed against the Shopping Center and the improvements, fixtures, equipment and other property located therein, and any other tax, general or special assessment, governmental charge, or other charge of any description imposed upon or in respect to any rent or other sums paid to Landlord hereunder or any occupancy or use of the Premises or the Shopping Center; provided, however, that the terms "**tax or taxes**" shall not include franchise, estate, inheritance and income taxes imposed upon Landlord.  With respect to any assessment which may be levied against or upon the Premises and which under applicable laws then in force may be evidenced by improvement or other bonds and may be paid in annual installments, there shall be included within the definition of Tax Expenses with respect to any fiscal year only the amount currently payable on such bonds for such tax fiscal year, or the current annual installment for such tax fiscal year.

(c)    The term "**Insurance Expenses**" shall mean and include all premiums and any increases and adjustments thereof, on a policy or policies of insurance providing protection against any peril included within the classification "fire and special extended coverage," together with loss of rent rider, to the extent of the full replacement cost of the Shopping Center, Comprehensive General Liability, Umbrella Liability, Boiler & Machinery coverage, Earthquake & Flood, plus the premiums on any other insurance that the beneficiary under any first trust deed might require.

(d)    The term "**Operating Expenses**" shall mean and include the total cost and expense incurred by Landlord in connection with or arising out of operation, maintenance and repair of the Common Area, as that term is defined herein, and the improvements located in the Shopping Center, but excluding principal and interest payments on mortgages.  Such Operating Expenses shall include, without limitation, all sums expended by Landlord for: all general maintenance and repairs; restoration; resurfacing; repainting of the exterior surfaces of the Shopping Center; re-striping and repairs of the parking lot; cleaning; removal of trash and debris; sweeping and janitorial services; lighting, HVAC and other utility expenses; maintenance, repair, cleaning and replacement of main plumbing lines, music program equipment and loudspeakers, sidewalks, stairways, curbs, Shopping Center signs and banners, sprinkler systems, planting and landscaping, floors, walls, ceilings, roofs, skylights, windows, directional signs, markers and bumpers, fire protection systems (including fire sprinklers), security systems (including alarm system, security guards or devices), lighting systems and fixtures (including replacement of tubes and bulbs), storm drainage systems, plumbing, electrical, HVAC and other utility systems which do not exclusively serve the interior of tenants' premises, and all mechanical equipment; management and other personnel hired to implement the foregoing services; water and other utilities; all on-site costs; management services, fees, wages and salaries of Landlord's employees (excluding therefrom Landlord's principals) directly engaged in the management and operation of the Shopping Center (including employee benefits and payroll taxes and other governmental charges); all costs and expenses pertaining to depreciation on maintenance and operating machinery and equipment, if owned, and rental paid for such machinery and equipment, if rented; the cost to Landlord of obtaining specific parking rights or privileges outside the physical boundaries of the Shopping Center in order to meet requirements imposed

EXHIBIT A

by any governmental agency. Common Area Costs shall also include a charge for appropriate reserves for the costs of repainting, re-roofing and resurfacing the Common Area. In addition, Operating Expenses shall include an allowance to Landlord for Landlord's supervision of the Common Area in an amount equal to ten percent (10%) of the total of the aforementioned Operating Expenses for each calendar year. Landlord may have any or all services and management performed in connection with the Common Area and Shopping Center provided by an independent contractor(s).

(e)    At the beginning of each calendar year, Landlord shall estimate Tenant's Pro Rata Share of the Additional Charges for such calendar year and shall deliver the estimate to Tenant who shall pay Landlord the amount of such estimate in equal monthly installments, in advance, on or before the first day of each and every calendar month during the period covered by the estimate on the basis that Minimum Rent is payable under Article 3.1. Landlord may adjust the estimated monthly charge on the basis of Landlord's experience and anticipated costs. Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a statement of Tenant's actual share for such period. If the estimated amount paid by Tenant under this Article for such period is less than Tenant's actual share for such period as shown on such statement, Tenant shall pay Landlord the difference between the amount paid by Tenant and the actual amount due within ten (10) days after the furnishing of each such statement. If the estimated amount paid by the Tenant for such period exceeds Tenant's actual share for such additional charges due from Tenant to Landlord, such amount shall be credited to Tenant and Landlord's next estimate of Tenant's Pro Rata Share of Additional Charges shall be adjusted accordingly, provided, however, if this Lease expires before or at the end of such calendar year, Landlord shall, if Tenant is not in default hereunder, promptly refund the excess amount to Tenant.

(f)    The term "**Pro Rata Share**" shall mean a percentage computed by dividing the square footage of the Premises by the total square footage of the Shopping Center. Tenant's Pro Rata Share of the Shopping Center is that percentage as specified in Article 2.9. Tenant's Pro Rata Share is subject to change with changes in the size of the Premises, the Shopping Center, and/or modifications to the Shopping Center's configuration. Notwithstanding the ratio set forth above, if Tenant benefits from a service which is utilized by less than all tenants of the Shopping Center, Tenant's Pro Rata Share for that service shall be equal to the ratio which the square footage of the Premises bears to the square footage of premises occupied by those tenants in the Shopping Center utilizing that particular service. Further, in those situations where occupants of freestanding buildings or major tenants such as department stores, supermarkets, drug stores or the like, maintain portions of the Common Area at their own expense, Tenant's Pro Rata Share shall be equal to the ratio which the square footage of the Premises bears to the square footage of the Shopping Center exclusive of the foregoing tenants or occupants.

3.4    **Rent**. All sums payable by Tenant under this Lease, including without limitation all sums due under this Article 3 and Articles 2, 5, 6, 10, 11, 13, 14, and Exhibit B (Tenant Improvement Agreement), and Exhibit C, (Sign Criteria) and any sums which Tenant is required to pay Landlord as a result of Landlord's performance of Tenant's obligations, together with interest thereon or any other sums which may be added for late payment thereof, as provided herein, shall be treated as, and deemed to be "Rent". In the event of any failure on part of the Tenant to pay any of the foregoing provided herein, Landlord shall have all rights, powers and remedies provided in this Lease, or by law, at equity or otherwise in the case of failure to pay Rent. The expiration or termination of this Lease shall not relieve Tenant of any obligations under this Lease which accrued prior thereto, including without litigation, payment of any sums due Landlord pursuant to the provisions of the Lease, and all of Tenant's obligations hereunder shall survive the expiration of the Lease unless otherwise expressly provided herein.

3.5    **Proration and Place of Payment**. Minimum Rent and Percentage Rent, Additional Charges, and any other Rent or charges hereunder for any partial lease month shall be prorated on a daily basis based upon the actual days in such month and, with respect to Percentage Rent, upon the actual Gross Sales made on such days. All amounts due Landlord under this Article 3 shall be payable by Tenant in accordance with the foregoing provisions at the office of the Landlord specified for notices below or such other place as Landlord may from time to time designate.

3.6    **Free Rent or Improvement Allowance**. If Landlord allows Tenant any so called "free rent" or "improvement allowance", such monetary concession is based upon Landlord's expectation that Tenant will perform the Lease throughout the Term thereof; and, in the event Tenant defaults prior to the expiration of the Lease, the amount of any free rent and/or tenant improvement allowance shall become immediately due and payable and be added to Landlord's damages. The additional damages shall be prorated if the default occurs after the first year of the Term of this Lease.

ARTICLE 4
TERM

4.1    **Commencement and Termination**. The Term of this Lease shall begin as of the date specified in Article 2.4 hereof and shall terminate upon the expiration of the number of months specified in Article 2.4 hereof after the Commencement Date as defined herein, unless sooner terminated as provided herein; provided, however, if the Commencement Date falls on a day other than the first day of a calendar month, then the number of months specified in Article 2.4 shall be measured from the first day of the month following the month in which the Commencement Date falls. This definition of the Term shall not be construed to limit the remedies of either party hereto should the other party default in its obligations hereunder. Within ten (10) days after Landlord's written request, Tenant shall execute a written

EXHIBIT A

confirmation in the form of the Confirmation of Lease Terms attached hereto as <u>Exhibit E</u>. The Confirmation of Lease Terms shall be binding upon Tenant unless Tenant objects thereto in writing within such ten (10) day period.

4.2    **Commencement Date**.  The date upon which the term of this Lease shall commence shall be that date specified in Article 2.4.

4.3    **Right of Early Occupancy**.  Landlord agrees to allow Tenant to take possession of the Premises as soon as reasonably possible after the execution of this Lease by both Tenant and Landlord. All possession and occupancy shall be under the same terms, covenants and conditions of this Lease. Tenant agrees to be responsible for all utility, insurance and other costs associated with taking early possession of and constructing tenant improvements within the Premises.

4.4    **Delivery of the Premises**.  Landlord shall use all reasonably practicable efforts to substantially complete its improvements in the Premises, if any, and deliver possession of the Premises as set forth in <u>Exhibit B-1</u>, (Landlord Work,) within one hundred eighty (180) days from the date hereof. However, if, for any reason whatsoever, Landlord is unable to so deliver possession of the Premises to Tenant neither Landlord nor its agents or representatives shall be liable to Tenant for any loss or damage resulting or arising therefrom, the term hereof shall not be extended provided, however, that Landlord and Tenant shall each have the right, exercisable within ten (10) days after the end of the one hundred eighty (180) day period described above, by notice to the other, to terminate this Lease without liability to the other party.

4.5    **Shopping Center Planning**.

(a)    At any time during the Term of this Lease, Landlord shall have the right to relocate the Premises to alternative space in the Shopping Center, or the commercial project owned or controlled by Landlord located at common address of 9859-10025 Carmel Mountain Road, San Diego, California, in accordance with the following: (1) the new premises ("**New Premises**") shall be substantially similar to the condition of the Premises, the same or greater in size and tenant improvements as the Premises described in this Lease, and shall be placed in that condition by Landlord at its cost; (2) the physical relocation of the Premises shall be accomplished by Landlord at its cost; (3) Landlord shall give Tenant at least thirty (30) days' notice of Landlord's intention to relocate the Premises; (4) Landlord shall diligently pursue the relocation of the Premises, and the Minimum Rent and all other sums and charges payable under this Lease shall be abated during the period of such relocation when Tenant's business is not operating due to the relocation and/or delays, if any, by the Landlord; and (5) all incidental costs incurred by Tenant as a result of the relocation, including, without limitation, costs incurred in changing addresses on stationery, business cards, directories, advertising and other such items, shall be paid by Landlord in a sum not to exceed One Thousand Dollars ($1,000.00) upon presentation to Landlord of paid invoices for such incidental costs.

(b)    If the New Premises are smaller than the Premises as they existed before the relocation, the Minimum Rent and other charges payable hereunder shall be adjusted by multiplying the Minimum Rent and other charges by a fraction, the numerator of which shall be the total Floor Area of the New Premises, and the denominator of which shall be the total Floor Area of the Premises before relocation.  If the New Premises are larger than the Premises as they existed before the relocation, Landlord and Tenant shall agree upon a reasonable Minimum Rent, which shall not be less than the Minimum Rent payable for the Premises in accordance with the terms of this Lease.  The parties shall immediately execute an amendment to this Lease stating the relocation of the Premises to the New Premises and the adjustment, if any, of Rent.

ARTICLE 5
SECURITY DEPOSIT

Tenant shall deposit with Landlord the sum set forth in Article 2.5 hereof as security for the full and faithful performance of each and every provision of this Lease to be performed by Tenant.  If the Minimum Rent from time to time increases during the Term of the Lease, Tenant shall thereupon deposit with Landlord additional security deposit so that the amount held by Landlord shall at all times bear the same proportion to current Minimum Rent as the original Security Deposit bears to the original Minimum Rent.  If Tenant defaults with respect to any provision of this Lease, including, but not limited to, the provisions relating to the payment of Rent or charges due under this Lease, Tenant's repair obligations or Tenant's obligations upon surrender of the Premises, Landlord may use, apply or retain all or any part of the Security Deposit for the payment of any Rent or any other loss or damage which Landlord may suffer by reason of Tenant's default.  If any portion of the Security Deposit is so used or applied, Tenant shall, within five (5) days after written demand therefore, deposit with Landlord an amount sufficient to restore the Security Deposit to its original amount.  Landlord shall not be required to keep the Security Deposit separate from its general funds and Tenant shall not be entitled to interest thereon.  If Tenant fully and faithfully performs every provision of this Lease to be performed by it, the Security Deposit, or any balance thereof remaining, shall be returned to Tenant at the expiration of the Term of this Lease and upon Tenant's vacation of the Premises or within thirty (30) days after the last payment from Tenant to Landlord is due pursuant to the Lease, whichever occurs later.  Tenant hereby waives the provisions of Section 1950.7 of the California Civil Code and all other provisions of law, now or hereafter in force, which provide that Landlord may claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant or to clean the Premises, it being

agreed that Landlord may, in addition, claim those sums specified in this Article 5 above, and all of Landlord's damages under this Lease and California law including, but not limited to, any damages accruing upon termination of this Lease under Section 1951.2 of the California Civil Code and/or those sums reasonably necessary to compensate Landlord for any other loss or damage, foreseeable or unforeseeable, caused by the acts or omissions of Tenant or any officer, employee, agent, contractor or invitee of Tenant.

ARTICLE 6

PAYMENT UPON EXECUTION

Notwithstanding anything to the contrary contained in this Lease, Tenant shall pay to Landlord simultaneously with its execution of this Lease the first installment of Minimum Rent and Additional Charges due hereunder (in the amount of $5,494.00) and the Security Deposit, as set forth in Article 2.5.

ARTICLE 7

OPERATION OF BUSINESS BY TENANT

7.1     **Use of Premises**.  Tenant shall use the Premises solely for the purpose of conducting the business described in Article 2.6 hereof and shall operate the Premises solely under the trade name described in Article 2.7 hereof.  Tenant shall not use or permit the Premises to be used for any other purpose, or under any other trade name, or by any concessionaire or licensee of Tenant without the prior written consent of the Landlord.  Tenant shall occupy the Premises and shall be open to the public for business within thirty (30) days following the Commencement Date.   Tenant shall comply with all requirements and restrictions set forth in the rules and regulations attached hereto as Exhibit D, (Rules and Regulations) and incorporated herein by this reference which Tenant agrees Landlord may amend or supplement from time to time and which amendments or supplements Tenant agrees to comply and abide by. Tenant's failure to keep and observe the rules and regulations set forth in Exhibit D, (Rules and Regulations) shall constitute a breach of this Lease. Tenant shall not use the Premises in any manner that will contribute waste, nuisance or unreasonable annoyance to other Tenants occupying space in the Shopping Center.  Tenant further shall not use the Premises for any use or purpose in violation of the laws, ordinances, regulations or requirements of any governmental or quasi-governmental authority having jurisdiction over the Premises.  Tenant shall not display signs, sell merchandise, allow grocery carts, portable signs, devices or any other objects to be stored or to remain outside the exterior walls and permanent doorways of the Premises.  Tenant shall use its best efforts to complete or cause to be completed all deliveries, loading, unloading and services to the Premises prior to 10:00 a.m. of each day and shall prevent delivery trucks and other vehicles servicing the Premises from parking or standing in service areas for undue periods of time. Landlord reserves the right to regulate further in a reasonable fashion the activities of Tenant in regard to its use of the Premises or the Common Area and Tenant agrees to abide by any such further regulations.

7.2     **Tenant's Operation of Business**.  Tenant covenants and agrees that, continuously and uninterruptedly during the Term hereof, it will operate and conduct the business, which it is permitted to operate and conduct under the provisions of Article 7 hereof, except while the Premises are untenantable by reason of fire or other unavoidable casualty.   Tenant will at all times keep and maintain within the Premises an adequate stock of merchandise of such size, character and quality as shall be designed to produce the maximum profitable volume of Gross Sales.  Tenant shall at all times have sufficient personnel to service and supply the ordinary demands and requirements of its customers. Tenant agrees to conduct Tenant's business at all times in a first class manner consistent with reputable business standards and practices in good faith and in such a manner that the high reputation of the Shopping Center is maintained.  Tenant shall not lower the quality of its merchandise or change the quality of its business.  Tenant shall conduct its business during such minimum days and hours, whether during the day or during the evening, as Landlord shall reasonably designate for the operation of business of the type operated by Tenant in the Shopping Center.  Tenant shall, at its own expense, keep display windows and signs, if any, in the Premises well lighted during the hours from sundown to 10:30 p.m., unless prevented by causes beyond the control of the Tenant.  Prior to conducting any promotional or sales activities outside the Premises, Tenant agrees to secure the necessary permits as required by the City of San Diego and provide Landlord's management agent with a certificate of insurance evidencing liability insurance for coverages not less than outlined under Article 12.1 of the Lease.   Said certificate shall name Landlord and its management agent as additional insureds.   Tenant agrees that all trash and rubbish of Tenant shall be deposited within prescribed receptacles in designated service areas.

7.3     **Signs**.  Tenant acknowledges and agrees that the Premises are a part of an integrated retail shopping center and that control of all signs and advertising matter by Landlord is essential to the maintenance of uniformity, propriety and aesthetic values in the Shopping Center.

(a)     Tenant shall purchase, erect and maintain, at its sole expense, a storefront fascia sign  for the Premises as set forth in Exhibit C, (Sign Criteria) attached hereto and incorporated herein by this reference  and Tenant shall be permitted to install the maximum storefront signage permitted under applicable laws and the Sign Criteria, subject to Landlord's prior written approval of such signage.  Tenant shall utilize Landlord's designated sign contractor to fabricate and install all such signing.

(b)     Tenant shall not place or maintain on the sidewalk, any window or exterior door or wall of the Premises, or in the interior of the Premises within one foot of any window or exterior door or wall of the Premises, any sign, awning or canopy, or advertising matter or other thing of any kind, and

EXHIBIT A

shall not place or maintain any decoration, lettering or advertising matter on the glass (or within one foot thereof) of any window or door of the Premises without first obtaining Landlord's prior written consent, which consent may be granted or denied in Landlord's sole and absolute discretion.  In no event shall Tenant place any sign or advertising matter on the roof of the Premises or on or at any other place in the Shopping Center outside the confines of the Premises.  Tenant agrees to maintain its signs, awnings, canopies, decorations, lettering, advertising matter or other things, as may be approved, in good condition and repair and remove the same prior to the expiration or earlier termination of this Lease. Signs placed in accordance with the provisions of the sign criteria attached hereto as Exhibit C, (Sign Criteria) are hereby approved by the Landlord.  Landlord may, at Tenant's cost, remove notice any item placed in violation of this Article 7.3.

(c)    Landlord shall have the right, at its option without prior notice to Tenant, to place, construct, and maintain in or around the Shopping Center a sign or signs identifying the Shopping Center and identifying the Tenant.

7.4    **Surrender**.  Upon the expiration or sooner termination of the Term of this Lease, Tenant shall surrender the Premises to Landlord broom clean and in the same condition and repair as at commencement of the Term, subject only to ordinary and reasonable wear and tear, and the provisions of Articles 10 and 19 of this Lease.

## ARTICLE 8
## PARKING AND COMMON AREA

8.1    **Definition and Use**.  The "**Common Area**" includes, without limitation, all driveways, landscaped areas, parking areas, loading docks, walkways and all other areas made available by Landlord for the general non-exclusive use of the tenants in the Shopping Center, and their customers, employees and invitees.  Subject to reasonable rules and regulations which Landlord shall have the right to establish, modify and enforce from time to time, and which Tenant agrees to observe, Tenant and its employees, customers and invitees may use the Common Area along with other authorized persons during the Term of this Lease.  Landlord may alter the size, location or character of the Common Area, and any other portion of the Shopping Center, in its discretion, including without limitation construction of additional improvements thereon, removing, altering and replacing existing improvements thereon and changing the location and number of driveways, entrances, exits, landscaped area, and all other facilities thereof.  Landlord may also hire personnel to keep the Common Area, the Shopping Center and the facilities serving the same in good condition.  Landlord also has the right to change the name, number and designation by which the Shopping Center is commonly known.  All Common Area which Tenant and its employees, representatives, customers and invitees may be permitted to use and occupy is to be used and occupied under a revocable license.  If the size, location or character of the Common Area or the Shopping Center, or the name of the Shopping Center, is changed as provided above, Landlord shall be subject to no liability therefore.  Tenant shall not be entitled to any compensation or diminution or abatement of rent or other charges, and such change shall not be deemed a constructive or actual eviction.  Notwithstanding the foregoing, nothing herein shall be deemed to create any liability or obligation upon Landlord for any injury to or death of persons or damage to or loss of property in the Common Area or the Shopping Center as a whole except as provided in Article 12 hereof.  Landlord may restrict parking of Tenant's employees to the areas outlined on Exhibit A.  Landlord retains the right to change the location of the employee parking areas from time to time.

Notwithstanding anything to the contrary in this Lease, Tenant acknowledges and agrees that (i) the Premises is adjacent to the premises currently being operated as a "24 Hour Fitness," (ii) Landlord has made no representation or warranty with respect to the availability of parking spaces in the Shopping Center, including the parking areas surrounding the Premises, at any particular time of day, and (iii) Landlord shall have no liability to Tenant, and Tenant hereby waives all claims Tenant may have, with respect to the availability of parking spaces in the Shopping Center, including the parking areas surrounding the Premises, at any particular time of day.

## ARTICLE 9
## ALTERATIONS BY LANDLORD

Landlord shall at all times have the right to alter the Shopping Center, to add improvements thereto, to change, add or delete common areas, to remove or demolish existing improvements, or to erect thereon any facade or other aesthetic improvement, and may for such purpose erect all structures which Landlord, in its sole and absolute discretion, deems appropriate, and Tenant shall not in any such event claim or be allowed or receive any damages for any injury or inconvenience occasioned thereby or any compensation diminution or abatement of rent, and such shall not be deemed constructive or actual eviction.

## ARTICLE 10
## ALTERATIONS BY TENANT

10.1    **Tenant Rights**.  Landlord agrees that Tenant may, at its own expense, and after giving Landlord not less than twenty (20) days prior notice of its intention to do so in order that Landlord may post and record notices of non-responsibility, from time to time during the Term hereof make such alterations and additions in and to the interior of the Premises (except those of a structural nature) as it may find necessary or convenient for its purposes; provided, that the value or utility of the Premises is not

EXHIBIT A

thereby diminished; and, provided further, that no such alterations or additions costing more in the cumulative aggregate during the Term of this Lease, than Two Thousand Five Hundred Dollars ($2,500) may be made without Landlord's prior written approval. Furthermore, no alterations or additions shall be made to any structural portions of the Premises, the store front, the demising walls, the ceiling or the roof of the Premises, nor shall Tenant erect any mezzanine or increase the size of the same, of one be initially constructed unless and until Tenant has obtained the prior written approval of Landlord. In no event shall Tenant make any penetration through the ceiling or roof of the Premises without Landlord's prior written approval. Also, no aerial or antenna shall be erected on the roof or exterior walls of the Premises without the prior written approval of Landlord.

10.2 **Installation by Tenant**. All alterations, additions or changes to the Premises which require the approval or consent of Landlord shall be made only after Landlord's prior written approval of the plans and specifications therefor and under the supervision of a competent architect or competent licensed structural engineer in accordance with plans and specifications therefore approved in advanced in writing by Landlord. In determining whether to grant or deny such approval, Landlord may consider the aesthetics of any proposed change and whether the change, when completed, would in Landlord's judgment enhance the physical appearance and value of the Shopping Center. Landlord may, as a condition of its consent, require that Tenant remove all such alterations, additions or changes and restore the Premises to their prior condition upon the expiration or earlier termination of this Lease. All fixtures installed by Tenant shall be new or completely reconditioned, and Landlord may inspect and approve or disapprove reconditioned fixtures. Upon completion of any alterations, additions or changes, Tenant agrees to cause a Notice of Completion to be recorded in the office of the Recorder of the County of San Diego in accordance with Section 3093 of the California Civil Code. All alterations, additions and changes shall become an integral part of the Premises upon installation thereof and shall not be removed by Tenant unless Landlord has requested Tenant to do so as a condition of its approval as provided above. All work with respect to alterations, additions and changes shall be done in a good and workmanlike manner, shall be diligently prosecuted to completion, and shall be performed and done strictly in accordance with all applicable laws and ordinances. Tenant shall obtain all necessary permits in connection with such work and, prior to the commencement of such work, submit to Landlord copies of all such permits. Tenant shall have the work of any such alterations, additions or changes performed in such a manner as to maintain harmonious labor relations and as not to obstruct or interfere with other tenants of the Shopping Center or their businesses or their employees, customers or invitees.

10.3 **Removal by Tenant**. All alterations, changes, decorations, additions and improvements made by Tenant, or made by Landlord on Tenant's behalf either by agreement under this Lease or under any separate agreement which constitute improvements to the Premises shall, upon the expiration or earlier termination of this Lease, remain upon and be surrendered with the Premises except tenant fixtures and furniture without compensation to Tenant unless Landlord has required their removal as a condition of its consent to their construction. The foregoing, however, shall not relieve Tenant of its obligation to insure and replace such improvements as provided in Articles 12.1 and 19 hereof. In no event shall Tenant remove any electrical panels, wiring or outlets or climatic control equipment (including shafts and vents) or plumbing or plumbing fixtures, without Landlord's prior written consent. Tenant shall be responsible for and shall repair all damage to the Premises, including without limitation, patching and filling of holes or structural damage resulting from the removal of Tenant's property or improvements. If Tenant fails to remove its improvements (if requested to do so by Landlord as provided above), trade fixtures, and any equipment, supplies, inventory or other movable personal property of Tenant, and to so restore the Premises on the expiration or earlier termination of this Lease, then Landlord may, at its option: (i) treat Tenant as a holdover in which event the provisions of Article 25 hereof shall apply, or (ii) elect to retain or dispose of in any lawful manner any or all of such items by giving Tenant, or any other person Landlord reasonably believes to be the owner of such items, the notice required by Section 1983 et seq. of the California Civil Code. Upon the expiration of the period in which said items may be claimed, as specified in such notice, title to any such items remaining in the premises may vest in Landlord or may be sold at a public sale. Tenant hereby waives all claims against Landlord for any damage resulting from Landlord's storage, retention or disposition of such items. Tenant shall be liable to Landlord for Landlord's costs of storing, removing, and disposing of any such items and such sums shall be immediately due and payable by Tenant as they accrue.

ARTICLE 11
MECHANIC'S LIENS

Tenant agrees that it will promptly pay all costs for work done by it or caused to be done by or for it in the Premises, and Tenant will keep the Premises and the Shopping Center free and clear of all mechanics' and other liens arising out of work performed, materials furnished or obligations incurred by or for Tenant or caused to be done by or for it or those claiming under Tenant. Tenant agrees to indemnify, defend and hold Landlord free and harmless against liability, loss, damage, costs, attorneys' fees, and all other expenses on account of claims of lien of laborers or materialmen or others for work performed, materials furnished or obligations incurred by or for Tenant or persons claiming under it. Should any such lien be made or filed against the Premises or the Shopping Center, Tenant shall discharge the same within fifteen (15) days after written request by Landlord. If Tenant shall desire to contest any claim of lien, it shall furnish Landlord with a bond in the statutory amount as may be requested by Landlord to prevent foreclosure during the pendency of the contest. If a final judgment establishing the validity or existence of a lien for any amount is entered, Tenant shall promptly pay the same. If Tenant defaults in paying any charge for which such a lien claim and suit to foreclose the lien have been filed, or does not bond the same immediately after the filing thereof, Landlord may (but shall not be required to) pay said

EXHIBIT A

claim and any costs.  The amount so paid, together with attorney's fees and costs incurred in connection therewith, shall be immediately due and owing from Tenant to Landlord. Should any claim of lien be filed against the Premises or the Shopping Center or any action affecting the title of such property be commenced, the Tenant, upon receiving notice of such lien or action, shall forthwith give Landlord notice thereof.

ARTICLE 12
INSURANCE AND INDEMNITY

12.1    **Liability and Property Insurance**.  Tenant shall, during any period of early occupancy under Article 4.3 and thereafter during the entire Term hereof, keep in full force and effect, at its sole expense, comprehensive policies of public liability and property damage insurance, with products liability endorsements if applicable, insuring against all liability with respect to the Premises, and the business operated by Tenant and any approved subtenants, licensees, or concessionaires of Tenant on the Premises, and with respect to the use, maintenance and occupancy thereof, with a combined single limit of not less than One Million Dollars ($1,000,000.00).  The policy shall also cover all of Tenant's trade fixtures, merchandise and other personal property from time to time in the Premises, and Tenant's improvements in the Premises as set forth in Exhibit B, (Tenant Improvement Agreement) or as constructed by Tenant under Article 10 hereof, for one hundred percent (100%) of their full replacement cost and shall provide for protection against all perils covered under the standard "fire and special extended coverage policy."  All the proceeds from such property damage policies shall be used for the replacement or repair of damaged property in the Premises unless this Lease shall terminate under the provisions of Article 19 hereof.  All of the foregoing policies shall name Landlord and any other parties in interest designated by Landlord and Tenant as additional named insured, and shall contain a clause that the insurer will not cancel or change the insurance without first giving Landlord thirty (30) days prior written notice.  The insurance shall be with an insurance carrier licensed to do business in California and having a rating in "Best Insurance Guide" of "A & VIII" or better. Tenant shall, upon occupancy, furnish Landlord with a certificate of such policy and whenever required, shall satisfy Landlord that such policy is in full force and effect.  All public liability, property damage and other casualty policies shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry.  All public liability and property damage policies shall contain a provision that Landlord, although named as an insured, shall nevertheless be entitled to recover under said policies for any loss occasioned to it, its servants, agents or employees by reason of the negligence of Landlord or Tenant.  All public liability and property damage insurance shall specifically insure the performance by Tenant of the indemnity agreement as to liability for injury to or death of persons or damage to or loss of property contained in this Article 12.   Tenant shall increase the amount of public liability or property insurance coverage if Landlord's lender or insurance broker deems said insurance coverage inadequate.

12.2    **Business Interruption/Extra Expense Insurance**.  Tenant shall, during any period of early occupancy under Article 4.3 and thereafter during the entire Term hereof, keep in full force and effect, at its sole expense, loss of income, business interruption and extra expense insurance in such amounts as will reimburse Tenant for direct and indirect loss of earnings and incurred costs attributable to the perils commonly covered by Tenant's property insurance described above for a period of not less than one (1) year.  Such insurance shall be carried with the same insurer that issues the insurance for the personal property.

12.3    **Worker's Compensation and Employer's Liability Insurance**.  Tenant shall, during any period of early occupancy under Article 4.3 and thereafter during the entire Term hereof, keep in full force and effect, at its sole expense, Worker's Compensation Insurance in such amounts as required by applicable California law and Employer's Liability Insurance with limits of One Million Dollars ($1,000,000.00) per accident.

12.4    **Blanket Policy**.  Tenant's obligation to carry the insurance provided herein may be brought within the coverage of a blanket policy or policies of insurance carrier and maintained by Tenant; however, Landlord must be named as an additional named insured and shall have the benefit of a cross-liability endorsement thereunder as its interest may appear, and the coverage afforded Landlord shall not be reduced or diminished by reason of the use of a blanket policy.

12.5    **Tenant's Failure to Procure Insurance**.  Tenant agrees that if Tenant does not carry and maintain any such insurance required to be carried pursuant to this Lease, Landlord may (but shall not be required to) procure such insurance on Tenant's behalf and charge Tenant the premiums, together with a ten percent (10%) handling charge, payable upon demand as additional rent.

12.6    **Increased Premiums**.  Tenant agrees that it will not, without Landlord's consent in each such instance, which Landlord may withhold in its sole discretion, keep, use, sell or offer for sale in or upon the Premises any article or do or permit any act which may be prohibited by the standard form of fire and special extended coverage policy.   Tenant agrees to pay any increase in premiums for fire and special extended coverage insurance that may be charged during the Term of this Lease on the insurance which may be carried by Landlord on the Premises or the Shopping Center resulting from the type of merchandise sold or activity conducted by Tenant in the Premises whether or not Landlord has consented to the same.  In determining whether increased premiums are the result of Tenant's use of the Premises, a schedule issued by the organization establishing the insurance rate on the Premises or the Shopping Center and showing the various components of such rate shall be conclusive evidence of the charges which makeup the insurance rate on the Premises.

EXHIBIT A

12.7    **Covenant to Hold Harmless**.    Tenant covenants with Landlord and its agents, employees, successors, representatives, and assigns that Landlord shall not be liable for any damage or liability of any kind or for any injury to or death of persons or damage to, or loss of, property of Tenant or any other persons occurring during any period of early occupancy under Article 4.3 or thereafter during the Term of this Lease, for any cause whatsoever, by reason of the use, occupation or enjoyment of the Premises, the operation of a business therein or the use, occupation, enjoyment or operation of the Shopping Center, except such damage or liability caused by the gross negligence or willful misconduct of Landlord.    Tenant covenants to indemnify, defend and hold Landlord, and its agents, employees, successors, representative and assigns, harmless from and against any and all claims, obligations, actions, damages, liabilities and expenses whatsoever, including attorneys' fees and disbursements, in connection with loss of life, personal injury and/or damage to or loss of property arising from or out of any occurrence, whether real or claimed, in, upon or at the Premises, or the occupancy or use by Tenant, or its agents, employees, customers and invitees, of the Premises, the Shopping Center or any part thereof, or any repairs, improvements or alterations which the Tenant may make or cause to be made upon the Premises or the Shopping Center, or in any way occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, invitees, lessees, licensees or concessionaires; provided, that Tenant shall not be obligated to indemnify Landlord against the gross negligence or willful misconduct of Landlord, its agents, employees, successors or assigns.    For the purposes hereof, the Premises shall include the service areas adjoining the same and any loading platform area allocated to the use of Tenant.    In case Landlord shall, without fault on its part be made a party to any litigation or administrative proceeding commenced by or against Tenant, Tenant shall indemnify, defend and hold Landlord harmless from any judgment or judicial or administrative determination arising therefrom and shall pay all costs and expenses, including reasonable attorneys' fees, court costs and other disbursements, incurred or paid by Landlord in connection with such litigation.    Landlord and Tenant each hereby waive any rights one may have against the other, on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their contents, or the Shopping Center, arising from any risk generally covered by fire and special extended coverage insurance; and the parties, on behalf of their respective insurance companies insuring such losses, waive any right of subrogation that one may have against the other.

ARTICLE 13
TAXES

Tenant shall pay before delinquency all taxes, assessments, license fees and all other government charges levied, assessed or imposed upon, or measured by its business operation and the cost or value of its trade fixtures, tenant improvements (including, but not limited to, those improvements which Tenant is required to make as set forth in Exhibit B, (Tenant Improvement Agreement) hereof and irrespective of whatever title to such improvements shall vest in Landlord or Tenant), merchandise and other personal property in, on or upon the Premises.    On demand by Landlord, Tenant shall furnish Landlord with satisfactory evidence of these payments.    In the event the assessed value of the Shopping Center is increased by the inclusion of a value placed upon Tenant's business operation or the cost or value of its trade fixtures, tenant improvements, merchandise and other personal property described above, and if Landlord pays such taxes, assessments, fees and charges described above or the increased portion thereof (which right Landlord shall have regardless of the validity of the levy) such amounts shall be immediately due and payable by Tenant to Landlord upon Landlord's demand therefor.    Landlord shall reasonably determine the basis of prorating any such assessments and such determination shall be binding upon both Landlord and Tenant.    No taxes, assessments, fees or charges referred to in this Article 13 and paid by Tenant shall be considered as taxes under the provisions of Article 3 hereof.

ARTICLE 14
UTILITIES

14.1    **Charges**.    Tenant shall be solely responsible for and shall pay all charges for water, gas, heat, electricity, telephone service and all other utilities delivered to the Premises.    Landlord further reserves the right to install, at Tenant's expense, separate meters for any public utility servicing the Premises for which a meter is not presently installed, in which event Tenant shall make payment when due directly to the public utility involved.    In the event the Premises are not separately metered for any utility, Tenant shall pay a reasonable proportion, to be reasonably determined by Landlord which determination shall be conclusive and binding upon Landlord and Tenant, of all jointly metered charges.    Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility service, and no such failure or interruption shall entitle Tenant to terminate this Lease or abate the rent and other charges hereunder.    Landlord shall also not be liable for any loss or damage to persons or property sustained by Tenant or other persons, which may be caused by the Shopping Center or the Premises, or any appurtenances thereto, being out of repair or by bursting or leakage of any water, gas, sewer or steam pipe, or by theft, or by any act or neglect of any Tenant or occupant of the Shopping Center.

14.2    **Energy Conservation**.    In the event any municipal, state, federal or other regulatory body (whether judicial, executive or legislative) imposes mandatory controls on Landlord or the Shopping Center relating to the use or conservation of energy or water, gas or electricity or the reduction of automobile use or automobile or other emissions, or in the event such a body requests voluntary cutbacks or conservation, or suggests voluntary guidelines for the use of energy or water, gas or electricity usage or the reduction of automobile use or automobile and other emissions and Landlord (in its sole direction) deems it advisable or appropriate to comply with such voluntary cutbacks, conservation

EXHIBIT A

or guidelines, Landlord may comply with such mandatory or voluntary controls to the extent it can control the use of energy or gas, water or electricity in the Shopping Center (including the Common Area) or the reduction of automobile use or automobile or other emissions. No such compliance shall in any event constitute a partial or complete eviction of Tenant hereunder, nor shall it entitle Tenant to terminate the Lease or to any abatement of rent or other charges, nor shall Landlord in any way be liable for damages or injury caused thereby to Tenant, Tenant's property, or business employees, customers or suppliers.

ARTICLE 15
MAINTENANCE OF THE PREMISES

15.1    **Tenant's Obligation for Maintenance**.  By initial entry hereunder, Tenant accepts the Premises as being in good and sanitary order, condition and repair.  Tenant, as its sole cost, and expense, shall keep the Premises in first rate order, condition and repair. Tenant's obligation with respect thereto shall include but are not limited to the maintenance, repair and replacement of the following: exterior entrances; storefronts; locks, signs and closing devices; plate glass and window moldings; partitions, demising walls, doors, door frames, casements, fixtures, ceilings, floor coverings, equipment and appurtenances; lighting, heating and plumbing fixtures in the Premises or exclusively serving the Premises; sewage facilities, electric motors, utility meters and heating, air conditioning (Tenant shall procure and maintain, at Tenant's expense, an air conditioning system maintenance contract with a company of which Landlord has given its prior written approval, or Landlord, at its sole option, may inspect and maintain such heating and air conditioning system at Tenant's sole expense) and electrical systems located in the Premises.  Tenant shall also make any and all repairs, maintenance, improvements or reconstruction in or to the Premises as may from time to time be required by any governmental agency having jurisdiction thereof.  Tenant shall repaint the Premises at such times as may reasonably be requested by Landlord.  If Tenant refuses or neglects to honor its obligations under this Article 15.1 to the reasonable satisfaction of the Landlord, such refusal or neglect, in addition to being a default hereunder giving rise to all the remedies for default hereunder, shall give Landlord the right, but not the obligation to, after prior notice to Tenant, make such repairs or cause the same to be made without liability to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixtures or other property or to Tenant's business by reason thereof.  Tenant shall pay Landlord's costs for making such repairs plus twenty percent (20%) for overhead immediately upon Landlord's demand thereof. Tenant hereby specifically waives the provisions of Sections 1932(1), 1941 and 1942 of the California Civil Code, to the extent they are applicable to the relationship between Landlord and Tenant, and any other laws relating to Tenant's right to maintain or repair the Premises at the Landlord's expense or deduct such expenses from the rent and/or terminate this Lease or vacate the Premises, it being expressly agreed that the parties' obligation with respect to such matters are controlled by this Lease.

15.2    **Hazardous Substances**.  Tenant shall not (either with or without negligence) cause or permit the escape, disposal, or release of any biologically or chemically active or other hazardous substances or materials (collectively "**Hazardous Substances**"). Tenant shall not allow the storage or use of such Hazardous Substances in any manner not sanctioned by law or by the highest standards prevailing in the industry for the storage and use of such Hazardous Substances, nor allow any Hazardous Substances to be brought into the Shopping Center and such Hazardous Substances, except to use in the ordinary course of Tenant's business, and then only after written notice is given to Landlord of the identity of such Hazardous Substances. Without limitation, "**Hazardous Substances**" shall include those substances and materials described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq., and applicable state or local laws and the regulations adopted under these acts.  If Landlord or any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of Hazardous Substances, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as Additional Rent.  In addition, Tenant shall execute affidavits, representations and the like from time to time at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of Hazardous Substances on the Premises.  In all events, Tenant shall indemnify Landlord in the manner elsewhere provided in this Lease from any release of Hazardous Substances on the Premises and the Shopping Center, if caused by Tenant or persons acting under Tenant, and Tenant shall be fully and completely liable to Landlord for any and all cleanup costs and any and all other charges, fees or penalties relating to the use, disposal, transportation, generation or sale of hazardous substances on the Premises or the Shopping Center which were brought onto the Premises or the Shopping Center by Tenant, or Tenant's agents, employees, invitees, contractors or subcontractors. The obligations of Tenant pursuant to this Article 15.2 shall survive the expiration or earlier termination of this Lease.  Notwithstanding the foregoing, Tenant shall be permitted to use and store within the Premises, reasonable quantities of those substances and materials which are typically found in the operation of Tenant's Permitted Use despite the fact that such substances and materials may be classified as Hazardous Substances; provided however, Tenant shall, at all times, store, transport, handle and dispose of Hazardous Substances in accordance with all applicable laws.

15.3    **Americans With Disabilities Act**.  Landlord and Tenant agree that the following terms, conditions and provisions shall apply to matters arising from or related to Americans With Disabilities Act, as discussed below:

(a)    <u>Americans With Disabilities Act ("ADA")</u>.  The ADA, as set forth In 42 U.S.C.S. §§ 12101 et seq., among other things, guarantees disabled persons access to public places and was designed to protect persons with disabilities in commercial setting.

(b)    Compliance with Legal Requirements.    At Tenant's sole cost, Tenant will promptly comply with all laws, statutes, ordinances, rules, regulations, orders, recorded covenants and restrictions, and requirements of all municipal, state, and federal authorities now or later in force, including, but not limited to, all provisions of the Americans with Disabilities Act; the requirements of any board of fire underwriters or other similar body now or later constituted; and any direction or occupancy certificate issued by public officers, insofar as they relate to the condition, use, or occupancy of the Premises (together "**Legal Requirements**").  The judgment of any court of competent jurisdiction, or the Tenant's admission in any action or proceeding against Tenant that Tenant has violated any Legal Requirement in the condition, use, or occupancy of the Premises, will be conclusive of that fact as between Landlord and Tenant.

(c)    Non-Responsibility of Tenant.  However, Tenant's compliance is not required for:

(i)    structural changes or changes to the electrical, mechanical, or plumbing systems of the Shopping Center, to the extent those changes are not necessitated by Tenant's acts or by improvements made for Tenant, other than the tenant improvements to be made pursuant to this Lease by Landlord, if any;

(ii)    alterations or improvements to the Shopping Center as a whole and the common areas of the Shopping Center or the premises of tenants generally that are not by law the tenants' responsibility with which to comply; and

(iii)    work necessitated by defects in the construction of the Shopping Center.

(d)    Landlord's Obligations.  Landlord will comply in a timely manner with all Legal Requirements that are not Tenant's responsibility under this Article to the extent that noncompliance would adversely affect Tenant's use or occupancy of the Premises.  Except as expressly excluded, any cost or expense of Landlord in complying with Legal Requirements will be included in the definition and cost of Additional Charges as defined in this Lease.

15.4    **Landlord's Obligation for Maintenance**.  Landlord shall maintain in good order and repair the exterior roof and structural components of, and all Common Area in, the Shopping Center, the costs of which shall be included within the definition of Operating Expenses.  Notwithstanding the foregoing, Landlord shall not be required to make repairs necessitated by Tenant's negligent or willful acts or omissions, or by Tenant's failure to perform or observe all the terms, covenants or conditions in this Lease or caused or necessitated by any alterations, additions or improvements made by Tenant or anyone claiming under Tenant.  If Landlord elects to make such repairs, Tenant shall pay Landlord's costs for making such repairs, plus twenty percent (20%) for overhead, immediately upon Landlord's demand therefor.  Anything to the contrary notwithstanding in this Lease, Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of Landlord unless Tenant has notified Landlord, in writing, of the need for such repairs and Landlord has failed to commence such repairs within a reasonably practicable period of time following Tenant's notification.  Furthermore, in no event shall Tenant have the right to make Landlord's repairs and or deduct or offset the cost of the same from the rent or other charges payable hereunder, or deduct or offset Tenant's damages resulting from Landlord's failure to make such repairs from the rent and other charges payable hereunder or terminate this Lease. Landlord shall have no obligation to repair, restore or maintain the Premises or the Shopping Center except as specifically provided in this Section 15.4.

ARTICLE 16
ESTOPPEL STATEMENT, SUBORDINATION AND ATTORNMENT

16.1    **Estoppel Statement**.  Tenant agrees to execute in recordable form and deliver to Landlord, within fifteen (15) days after request therefor by Landlord, a written statement, certifying (a) that this Lease is in full force and effect, that neither Tenant nor (to the best knowledge of Tenant) Landlord is then in default under this Lease, and that Tenant knows of no event that has occurred which, with notice or the passage of time or both, would constitute a default under this Lease by Landlord or Tenant, (b) the dates of commencement and expiration of the term of this Lease, (c) that rent is paid currently without any offset or defense thereto, (d) the amount of rent, if any, paid in advance, and (e) whether the Lease has been modified and, if so, identifying such modification. Tenant shall, in addition, certify in connection with such estoppel statement as to such other matters as may reasonably be required by Landlord or Landlord's lender.  If Tenant is unable to certify with respect to any of the foregoing matters, Tenant shall state with particularity the reason therefor, but except as thereby limited shall make the foregoing representations.  Tenant understands that the foregoing representations are for the benefit of, and may be enforced by, third parties.

16.2    **Subordination**.  This Lease is subject and subordinate to all ground or underlying leases, mortgages and deeds of trust which now affect the Shopping Center, the Premises or any portion thereof or interest therein, and to all renewals, modifications, consolidations, replacements and extensions thereof.  However, if the lessor under any such lease or the holder or holders of any such mortgage or deed of trust advises Landlord that it desires or requires this Lease to be prior and superior thereto, upon notification thereof to Tenant this Lease shall be deemed to be prior and superior to such mortgage, deed of trust or lease.  Upon the written request of Landlord to Tenant, Tenant agrees promptly to execute, acknowledge and deliver any documents which Landlord or such lessor holder or holders deem necessary or desirable for purposes thereof.  Further, Landlord shall have the absolute

EXHIBIT A

right to cause this Lease to be and become and remain subject and subordinate to any and all ground or underlying leases, mortgages or deeds of trust which may hereafter be executed covering or affecting the Shopping Center, the Premises, the real property thereunder or any portion thereof or any interest therein, or any renewals, modifications, consolidations, replacements or extensions thereof, for the full amount of all advances made or to be made thereunder and without regard to the time or character of such advances, together with interest thereon and subject to all the terms and provisions thereof. Tenant agrees that it will, within fifteen (15) days after written request therefor, execute, acknowledge and deliver to Landlord any and all documents requested by Landlord or necessary or proper to assure the subordination of this Lease to any such mortgage, deed of trust or leasehold estate.

16.3    **Attornment**.  Notwithstanding anything to the contrary set forth in this Article 16, Tenant hereby attorns and agrees to attorn to any person, firm or corporation or other entity purchasing or otherwise acquiring the Shopping Center, the Premises or the real property thereunder or any portion thereof or interest therein at any sale or other transfer including any proceeding or other exercise of any rights, powers or remedies under any mortgages or deeds of trust or ground or underlying leases as if such person, firm or corporation or other entity had been named as landlord herein.

16.4    **Power of Attorney**.  If Tenant does not execute any of the documents required by this Article 16 within ten (10) days after request therefor from Landlord, then Tenant hereby irrevocably appoints Landlord the attorney-in-fact of Tenant to execute and deliver any document for and in the name of Tenant which Tenant is required to execute and deliver under the terms of this Article 16; such power, being coupled with an interest, is irrevocable.

ARTICLE 17
ASSIGNMENT AND SUBLETTING

17.1    **Landlord's Consent Required**.  Tenant shall not, voluntarily or involuntarily, because of death, divorce, disability, or by operation of law, or otherwise pledge, hypothecate or encumber its interest in this Lease or the Premises or sublease all or any portion of the Premises, or allow any other person or entity to occupy or use all or any part of the Premises (collectively "**Transfer**"), without first obtaining Landlord's prior written consent.  Any Transfer without such consent, shall be void and, at the option of Landlord, shall terminate this Lease.  Any consent to any Transfer, which may be given by Landlord, shall not constitute a waiver by Landlord of the provisions of this Article 17 or a release of Tenant from the full performance by it of the covenants herein contained.  If Tenant is a partnership, a transfer of any interest of a general partner, a withdrawal of any general partner from the partnership, or the merger or dissolution of the partnership, shall be deemed to be a Transfer.  If Tenant is a corporation, unless Tenant is a public corporation whose stock is regularly traded on a national stock exchange, or is regularly traded in the over-the-counter market and quoted on NASDAQ, any dissolution, merger, consolidation or other reorganization of Tenant or sale or other transfer of a percentage of capital stock of Tenant which results in a change of controlling persons, or the sale or other transfer of all or substantially all of the assets of Tenant, shall be deemed to be a Transfer.  If Tenant is a limited liability company, any sale or other transfer of a percentage of the membership interests of Tenant which results in a change of controlling persons, or the sale or other transfer of all or substantially all of the assets of Tenant, shall be deemed to be a Transfer.  For purposes of this Article 17, the term "**Transferee**" includes without limitation, assignees, subtenants, or any other party who acquires an interest in the Premises or this Lease by way of pledge, hypothecation or encumbrance.

17.2    **Transfer Notice**.  Tenant shall give Landlord at least sixty (60) days advance written notice ("**Transfer Notice**"), of its desire to proceed with a Transfer and shall submit in writing to Landlord (i) the name of the proposed Transferee, (ii) in detail, the nature of the proposed Transferee's business to be carried on in the Premises, (iii) whether Tenant proposes to assign the Lease, sublet the Premises, enter into a license or concession agreement, or change ownership, (iv) the proposed effective date of the Transfer, (v) all the material terms and conditions of the proposed Transfer, (vi) financial statements, income statements and balance sheets for the two (2) most recent completed fiscal or calendar years of the proposed Transferee, and (vii) a bank reference.  A copy of the proposed agreement documenting the Transfer shall accompany the Transfer Notice, or if none, a copy of any offers, draft agreements, letters of commitment or intent, and other documents pertaining to the proposed Transfer.  Thereafter, Tenant shall furnish such supplemental information as Landlord may reasonably request concerning the proposed Transferee.

17.3    **Landlord's Election**.  At any time within fifteen (15) working days after Landlord's receipt of the information specified above, Landlord may, by written notice to Tenant, elect to (i) terminate this Lease not less than forty five (45) nor more than ninety (90) days after the end of said fifteen (15) working day period as to the portion (including all) of the Premises so proposed to be transferred, with a proportionate abatement in Rent payable hereunder, (ii) consent to the Transfer, or (iii) reasonably disapprove of the Transfer, setting forth in writing Landlord's grounds for doing so.  Such grounds for disapproval may include, without limitation, non-suitability of the proposed use for the Premises, violation of Landlord's third party agreements, including loan documents and non-competition covenants of Landlord respecting radius, locations, use or exclusivity in any other lease, financing agreement or other agreement relating to the Shopping Center or Landlord's other shopping centers, need for alteration of the Premises or the Common Area, an inappropriate use in light of the Shopping Center's existing tenant mix, a material increase in the impact upon the Common Area or the parking facilities, a material increase in the demands upon utilities and services, a possible reduction in payments of Percentage Rent to Landlord, likelihood of success of the Transferee's business in the Shopping Center, a possible material

EXHIBIT A

adverse effect upon the reputation of the Shopping Center from the nature of the business to be conducted, or a reputation for financial reliability on the part of the proposed Transferee which is unsatisfactory in the reasonable judgment of Landlord, that Tenant is in default of its obligations under this Lease or that Landlord has not received assurances acceptable to Landlord that all past due amounts owing from Tenant to Landlord will be paid and all other defaults by Tenant will be fully cured prior to the effective date of the proposed Transfer.  If Landlord consents to the Transfer within the fifteen (15) day period, Tenant may thereafter enter into such Transfer agreement, upon the terms and conditions and as of the effective date set forth in the information furnished by Tenant to Landlord.  If Landlord consents to the Transfer and Tenant does not consummate the Transfer within fifteen (15) days after receipt of Landlord's decision, the provisions of this Article 17 shall once again apply.

      17.4    **Assumption of Lease Obligations**.  Each permitted Transferee, other than Landlord, shall assume and be deemed to have assumed this Lease and shall be and remain liable, jointly and severally, with Tenant for the payment of the Rent and for the due performance or satisfaction of all of the provisions, covenants, conditions and agreements herein contained on Tenant's part to be performed or satisfied.  No Transfer shall be binding on Landlord unless such Transferee or Tenant shall deliver to Landlord a counterpart original of the instrument evidencing such Transfer which contains a covenant of assumption by the Transferee, but the failure or refusal of the Transferee to execute such instrument of assumption shall not release or discharge the Transferee or the Tenant from its liability as set forth herein.  Any permitted Transfer shall not, in any way, affect or limit the liability of Tenant under the terms of this Lease, even if after such Transfer the terms of this Lease are materially changed or altered without the consent of Tenant, the consent of whom shall not be necessary.

      17.5    **Occupancy Period**.  Landlord and Tenant acknowledge that the Shopping Center is an interdependent enterprise and that each party's realization of the benefits of this Lease depends upon the ability of Tenant to create and maintain a successful and profitable retail operation in the Premises.  Landlord and Tenant further acknowledge that the character and quality of Tenant's business, and of the Shopping Center, will be enhanced by Tenant's use of its best efforts, for a reasonable period of time, to establish a successful business.  Landlord and Tenant further agree that one (1) year is a reasonable period of time for Tenant to attempt to achieve this goal.  Accordingly, Tenant agrees that for a period of one (1) year from the date Tenant opens for business in the Premises (or one (1) year from the Commencement Date if Tenant does not open for business on the Commencement Date) (the "**Occupancy Period**"), Tenant shall not, and shall not have the power to, Transfer all or any portion of its interest in this Lease.  After the expiration of the Occupancy Period, Landlord's consent to any Transfer shall be subject to the terms, covenants and conditions contained in this Article 17.

      17.6    **Additional Provisions Regarding Transfers**.  Landlord may accept Rent from any person other than Tenant, pending approval or disapproval of a Transfer.  Neither a delay in the approval or disapproval of such Transfer, nor the acceptance of Rent, shall constitute a waiver or estoppel of Landlord's right to exercise its remedies for the breach of any of the terms or conditions of this Article 17 or this Lease.  If Tenant's obligations under this Lease have been guaranteed by third parties, then any Transfer, and Landlord's consent thereto, shall not be effective unless said guarantors give their written consent to such Transfer.  Furthermore, Landlord may consent to subsequent Transfers or any amendments or modifications thereto without notifying Tenant or anyone else liable on the Lease, and without obtaining their consent, and such action shall not release such persons from liability under this Lease; however, such persons shall not be responsible to the extent any such amendment or modification enlarges or increases the obligations of the Tenant or Transferee under this Lease.  Upon the occurrence of any Event of Default, Landlord may proceed directly against Tenant, any guarantors or anyone else responsible for the performance of this Lease, including the Transferee, without first exhausting Landlord's remedies against any other person or entity responsible therefor to Landlord, or any security held by Landlord or Tenant.  Landlord's written consent to any Transfer by Tenant shall not constitute an acknowledgment that no Event of Default then exists under this Lease, nor shall such consent be deemed a waiver of any then existing Event of Default, except as may be otherwise acknowledged by Landlord at that time.  The discovery of the fact that any financial statement relied upon by Landlord in giving its consent to a Transfer was materially false shall, at Landlord's election, render Landlord's consent null and void.  Any sums or other economic consideration received by Tenant as a result of a Transfer, however denominated, which exceed, in the aggregate (i) the total sums which Tenant is obligated to pay Landlord under this Lease (prorated to reflect obligations allocable to any portion of the Premises subleased if the Transfer is a sublease of less than all of the Premises), plus (ii) the unamortized value of leasehold improvements to the Premises paid for by Tenant, depreciated on a straight line basis over the Term, shall be paid to Landlord as Additional Rent under this Lease without affecting or reducing any other obligations of Tenant hereunder.  In the event of any approved Transfer of this Lease in connection with the sale of all or substantially all of the assets of Tenant used in connection with the conduct of Tenant's business on the Premises, the amount of consideration attributable to the Transfer of the Lease shall be reasonably determined by Landlord.  Tenant shall only use such form of assignment as is provided by Landlord, and once Landlord has approved the completed assignment form, such assignment shall not be changed or modified without Landlord's prior written consent.

      17.7    **Special Provisions Regarding Subletting**.  Regardless of Landlord's consent, the following terms and conditions shall apply to any subletting by Tenant of all or any part of the Premises, and shall be deemed included in all subleases under this Lease, whether or not expressly incorporated therein:

EXHIBIT A

17.7.1   Tenant immediately and irrevocably assigns to Landlord, as security for Tenant's obligations under this Lease, all Rent from any subletting of all or a part of the Premises as permitted by this Lease, and Landlord, as assignee and as attorney in fact for Tenant, or a receiver for Tenant appointed on Landlord's application, may collect such Rent and apply it toward Tenant's obligations under this Lease; except that, until the occurrence of an Event of Default by Tenant.  Tenant shall have the right to collect such Rent.  Tenant hereby irrevocably authorizes and directs any such sublessee, upon receipt of written notice from Landlord stating that an event of default exists, to pay to Landlord the rents due and to become due under the sublease.  Tenant agrees that such sublessee shall have the right to rely upon any such statement and request from Landlord, and that such sublessee shall pay such Rents to Landlord without any obligation or right to inquire as to whether such default exists, and notwithstanding any notice from or claim from Tenant to the contrary.  Tenant shall have no right or claim against said sublessee or Landlord for any such Rents so paid by said sublessee to Landlord.

17.7.2   Tenant shall use only such form of sublease as is provided by Landlord, and once Landlord has approved the completed sublease form, the sublease shall not be changed or modified without Landlord's prior written consent.

17.7.3   Upon the occurrence of an Event of Default by Tenant under this Lease, Landlord, at its option and without any obligation to do so, may require any sublessee to attorn to Landlord, in which event Landlord shall undertake the obligations of Tenant under such sublease from the time of the exercise of said option to the termination of such sublease; provided, however, Landlord shall not be liable for any prepaid rents or Security Deposit paid by such sublessee to Tenant, or for any other prior defaults of Tenant under such sublease.

17.7.4   With respect to any subletting to which Landlord has consented, Landlord agrees to deliver a copy of any notice of default by Tenant to the sublessee.

17.8   **Lease Assignment in Bankruptcy**.  In the event this Lease is assigned to any person or entity pursuant to provisions of the Bankruptcy Code, 11 USC Section 101, et seq., (the "Bankruptcy Code"), any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall remain the exclusive property of Landlord, and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code.  Any and all monies or other consideration constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid to or turned over to Landlord.

17.8.1   If Tenant, pursuant to this Lease, proposes to assign the same pursuant to the provisions of the Bankruptcy Code, to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of the proposed assignment setting forth (i) the name and address of such person, (ii) all of the terms and conditions of such offer, and (iii) the assurances referred to in Section 365(b)(3) of the Bankruptcy Code, shall be given to the Landlord by the Tenant no later than twenty (20) days after receipt of such offer by the Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall make application to a Court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to the Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person, less any brokerage commissions which may be payable out of the consideration to be paid such person for the assignment of this Lease.  Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on or after the date of such assignment.  Any such assignee shall, upon demand, execute and deliver to Landlord an instrument confirming such assumption.

17.8.2   The following factors may be considered by the Landlord (but shall not limit the reasonable factors Landlord may consider) as necessary in order to determine whether or not the proposed assignee has furnished Landlord with adequate assurances of its ability to perform the obligations of this Lease and the impact of the proposed use on the Premises and the Shopping Center: (i) the adequacy of a Security Deposit; (ii) net worth and other financial elements of the proposed assignee and assignee's guarantor(s), if any; (iii) suitability of the proposed use for the Premises and/or the Shopping Center; (iv) the requirement of alteration of the Premises; (v) the proposed use is appropriate in light of the Shopping Center's existing tenant mix; (vi) a material increase in the impact upon the Common Area of the Shopping Center or the parking facilities; (vii) a material increase in the demands upon utilities and services furnished to the Premises by the Landlord; (viii) a possible reduction in payments of Percentage Rent to Landlord; (ix) likelihood of success of the sublessee's or assignee's business in the Shopping Center; (x) desirability of the proposed use; and (xi) a possible material adverse effect upon the reputation of the Shopping Center from the nature of the business to be conducted.

17.8.3   In the event Landlord rejects the proposed assignee (and the Bankruptcy Court does not issue an order to the contrary), the rights and obligations of the parties hereto shall continue to be governed by the terms of this Lease, and Tenant shall have all the rights of a Tenant under applicable California law.

EXHIBIT A

17.8.4  In the event of bankruptcy or other debtor creditor proceedings against Tenant, the Security Deposit shall be deemed to be applied first to the payment of Rent and other charges due Landlord for the earliest periods prior to the filing of such proceeding.

17.8.5  Any other provision of this Lease to the contrary notwithstanding, it is specifically understood and agreed to by the parties that if all or substantially all of the Tenant's assets are placed in the hands of a trustee or a liquidating trust, and such trusteeship or liquidating trust continues for a period of thirty (30) days, or if the Tenant effects a plan of liquidation, then this Lease, or any interest in and to the Premises, shall not become an asset of any such proceedings and, in addition to any and all rights or remedies of the Landlord hereunder or by law provided, Landlord may, at its option, by giving written notice to Tenant, declare the Term of this Lease ended, and Tenant shall have no further claim of any type under this Lease.

17.9    **No Merger**.  No merger shall result from Tenant's sublease of the Premises under this Article 17, Tenant's surrender of this Lease, or the termination of this Lease in any other manner.  In any such event, Landlord may terminate any or all subtenancies or succeed to the interest of Tenant as sub-landlord thereunder.

17.10    **Conditions Deemed Reasonable**.  Tenant acknowledges and agrees that each of the rights of Landlord set forth in this Article 17 above in the event of a proposed Transfer is a reasonable restriction on Transfer for purposes of California Civil Code Section 1951.4.

17.11    **Tenant's Remedy**.  Landlord shall have no liability to Tenant or to any proposed Transferee in damages if it is adjudicated that Landlord's consent has been unreasonably withheld and such withholding of consent constitutes a breach of this Lease or other duty to Tenant, the proposed Transferee or any other person on the part of Landlord.  In such event, Tenant's sole remedy shall be to have the proposed Transfer declared valid as if Landlord's consent had been duly and timely given (although Tenant shall be entitled to reasonable attorneys' fees if it is determined to be the prevailing party in such litigation.  Tenant hereby specifically waives its rights under California Civil Code Section 1995.310 (and any successor provision) and agrees that this Article 17.11 shall govern the rights of Tenant for failure of Landlord to consent to a Transfer.

17.12    **Continuing Liability of Tenant**.  If Tenant's Transferee defaults pursuant to this Lease, Landlord may proceed directly against Tenant without pursuing remedies against the Transferee.  Tenant agrees to defend, indemnify and hold Landlord harmless with respect to all costs (including reasonable attorneys' fees expended by Landlord in connection therewith) and liability for compensation claimed by any broker or agent in connection therewith any Transfer of Tenant's interest pursuant to this Lease.

ARTICLE 18
ADVERTISING AND PROMOTION FUND

18.1    **Advertising and Promotion Fund**.

(a)    Landlord may, from time to time, establish an advertising and promotion service designed to furnish and maintain professional advertising and sales promotions for the benefit of all tenants in the Shopping Center.  In conjunction therewith, Landlord will establish a separate fund to be known as the Promotion Fund, the proceeds of which are to be expended solely for advertising, promotion, public relations designed to promote the Shopping Center, and for related administrative expenses, at such times and such manner as shall be determined by Landlord.

(b)    Tenant hereby agrees to pay monthly, as Additional Rent, into the Promotion Fund for such advertising and promotion service an amount equal to 1/12 of the product obtained by multiplying the amount specified in Article 2.10 above by the area of the Premises.  The amount of Tenant's annual payment into the Promotion Fund shall be increased each January during the Term (provided that a majority of the Tenants in the Shopping Center are obligated to pay such increase) by a percentage equal to the annual percentage increase in the Index for each year of the Term using the November preceding the first January following the Commencement Date as the base month and each succeeding November as the comparison month.

As used herein, the "**Index**" shall mean Consumer Price Index, U.S. City Average, All Urban Consumers, All Items Index Base 1982-84=100 as published by the United States Department of Labor, Bureau of Labor Statistics.  Should the Bureau of Labor Statistics discontinue the publication of the Index, or publish the Index less frequently, or alter the Index in some other manner, then Landlord shall adopt a substitute Index or substitute procedure which reasonably reflects and monitors consumer prices.

18.2    **Advertising of Tenant**.  With the exception of national or regional advertising, Tenant, at its sole expense, agrees to refer to the Shopping Center by the name provided in Article 2.1, if one is so provided, in designating the location of the Premises in all local newspaper or other advertising, stationery, other printed material and in all other references to location, and to include the address and identity of its business activity in the Premises in all advertisements made by Tenant for its operation at the Shopping Center.

EXHIBIT A

ARTICLE 19
DESTRUCTION OF PREMISES

19.1    **Destruction Covered by Insurance**.  In the event the Premises or the Shopping Center of which the Premises are a part are damaged by fire or other perils which are fully covered by fire and extended coverage insurance, Landlord agrees to forthwith repair the same, and this Lease shall remain in full force and effect.  Landlord may elect, by written notice to Tenant within sixty (60) days after such casualty, to terminate this Lease in lieu of restoring the Premises if either (i) the Shopping Center or Premises are damaged or destroyed to the extent of more than twenty five percent (25%) of their replacement cost, or (ii) the damage is such that the Shopping Center or the Premises cannot be repaired and restored within one hundred eighty (180) days after the casualty.

19.2    **Destruction Not Covered By Insurance**.  In the event the Premises or the Shopping Center are damaged as a result of any cause other than the perils covered by fire and extended coverage insurance, Landlord shall have the option to (i) repair or restore such damage, this Lease continuing in full force and effect; or (ii) give notice to Tenant at any time within sixty (60) days after such damage, terminating this Lease as of the date specified in such notice, which date shall be no less than thirty (30) days and no more than sixty (60) days after the giving of such notice.  In the event Landlord gives notice of its election to terminate this Lease, as is provided for in this Article 19.2, the Lease shall terminate, and all interest of the Tenant in the Premises shall terminate on the date so specified in such notice, and the Rent shall be paid up to date of termination.

19.3    **Repair Costs Exceeding Insurance Coverage**.  If the cost of the restoration of the Premises or the Shopping Center exceeds the amount of proceeds received from insurance, Landlord may elect to terminate this Lease by giving notice to Tenant within thirty (30) days after determining that the restoration cost will exceed the insurance proceeds.  If Landlord elects to terminate this Lease, and Tenant does not elect to contribute toward the cost of restoration, this Lease shall terminate and all interest of the Tenant in the Premises shall terminate on the date so specified in such notice and the Rent shall be paid up to date of termination.  If the destruction was caused by an act or omission of Tenant, or its agents or employees, Tenant shall immediately pay Landlord, upon Landlord's demand, the difference between the actual cost of restoration and any insurance proceeds received by Landlord.

19.4    **Repairs That Cannot Be Completed Within One Hundred Eighty Days**.  Within sixty (60) days after the date of Tenant's notice to Landlord of such damage or destruction ("**Damage Notice Date**"), Landlord shall give Tenant notice of Landlord's good faith determination of whether or not the damage or destruction can be repaired under applicable laws, within one hundred eighty (180) days after the Damage Notice Date.  In the event Landlord determines that such repairs to the Premises and/or the Shopping Center cannot, in Landlord's good faith judgment, be substantially completed under applicable laws within one hundred eighty (180) days after the Damage Notice Date, then Landlord shall notify Tenant of such determination.  In such notice, Landlord shall either agree to undertake such repairs (in which event the notice shall include Landlord's estimate of the time required to complete the same) or elect to terminate this Lease.  If Landlord agrees to undertake the repairs, but states that the required repairs will not be substantially completed within one hundred eighty (180) of the Damage Notice Date, Tenant shall have an option, exercisable by written notice thereof delivered to Landlord not later than the thirtieth (30th) day after Landlord's delivery of Landlord's notice that the repairs will not be completed within such one hundred eighty (180) day period, to terminate this Lease.  If neither Landlord nor Tenant exercise a right of termination following Landlord's determination that the repairs will take more than one hundred eighty (180) days, then Landlord shall diligently undertake to repair such damage or destruction.

19.5    **Abatement of Rent**.  In the event of reconstruction of the Premises under this Article 19, the Rent otherwise payable under this Lease shall be abated proportionally with the degree to which Tenant's use of the Premises is impaired.  Such abatement shall commence on the date of such damage or destruction and continue during the period while Landlord is completing the repairs required of it under this Article 19.  Tenant shall continue to operate its business on the Premises during any such abatement period to the extent reasonably practicable from the standpoint of prudent business management.  Tenant shall not be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises, Shopping Center or Tenant's personal property, or for any inconvenience or annoyance suffered by reason of damage or destruction thereto, or the reconstruction or replacement thereof.

19.6    **Restrictions on Restoration**.  If the existing laws do not permit the restoration of the Premises to substantially the condition existing at the time of such damage or destruction, either party may terminate this Lease immediately following receipt of notice that restoration is forbidden, by giving written notice to the other party.

19.7    **Destruction**.  Within Last Year of Term.  Notwithstanding anything to the contrary contained in this Article 19, Landlord shall have no obligation whatsoever to repair, reconstruct or restore the Premises or any portion of the Shopping Center when the damage occurs during the last twelve (12) months of the Term or any extension thereof.  In the event Landlord elects not to repair, reconstruct or restore the Premises during the last twelve (12) months of the Term, or any extension thereof, Landlord shall give Tenant written notice of Landlord's election to terminate the Lease within thirty (30) days after the date of occurrence of such damage.

EXHIBIT A

19.8    **Destruction of Tenant's Personal Property, Tenant Improvements or Property of Tenant's Employees**. It is hereby expressly agreed that Landlord will not be obligated to carry insurance of any kind on Tenant's furniture, furnishings, fixtures, equipment or other personal property (collectively "**Personal Property**") and the tenant improvements located within the Premises and in the event of damage or destruction to the Premises or the Shopping Center, under no circumstances shall Landlord be required to repair any injury or damage by fire or other cause, or to make any repairs to, or replacements of, Tenant's Personal Property or the tenant improvements. Landlord shall have no responsibility for any contents placed or kept in or on the Premises or the Shopping Center by Tenant or Tenant's employees.

19.9    **Exclusive Remedies**. Notwithstanding any destruction or damage to the Premises, the Shopping Center, and/or the Common Area, Tenant shall not be released from any of its obligations under this Lease, except to the extent and upon the conditions expressly stated in this Article 19. Tenant hereby expressly waives the provisions of California Civil Code Sections 1932(2) and 1933(4) with respect to any damage or destruction of the Shopping Center and/or the Premises and agrees that the provisions of this Article 19 shall exclusively govern its rights.

19.10    **Termination Advance Payments and Insurance Proceeds**. Upon termination of this Lease pursuant to this Article 19, an equitable adjustment shall be made concerning advance Rent and any advance payments made by Tenant to Landlord. Landlord shall, in addition, return to Tenant so much of Tenant's Security Deposit as has not been applied by Landlord, as provided for under the terms of this Lease. In the event of termination of this Lease, all proceeds from the fire and extended coverage insurance under Article 12.1 covering Tenant's Personal Property shall be paid to Tenant.

19.11    **Termination**. Upon any termination of this Lease under any of the provisions of this Article, this parties shall be released thereby, without further obligation to the other, from the date possession of the Premises is surrendered to the Landlord, except for items which have heretofore accrued and are then unpaid, and those obligations, if any, which by the terms of this Lease, survive such termination.

ARTICLE 20
EMINENT DOMAIN

20.1    **Total Taking of the Premises**. If the entire Premises are acquired or taken through exercise of the power of eminent domain, this Lease shall terminate as of the date Tenant is required to vacate the Premises and all rent paid up to that date shall be the property of the Landlord. Tenant shall have no claim against Landlord or the exercising authority for the value of any unexpired portion of the term of this Lease. For purpose of this Article 20, a voluntary sale or conveyance to the authority exercising the power of eminent domain made in lieu of such a taking but under threat of the same shall be deemed an exercise of the power of eminent domain.

20.2    **Partial Taking of the Premises**. If twenty-five percent (25%) or more of the floor area of the Premises (including mezzanines) is acquired or taken through exercise of the power of eminent domain, then this Lease shall terminate at the election of either Landlord or Tenant as of the date title vests in the taking authority or such earlier date as Tenant is required to vacate the Premises. Tenant shall have no claim against Landlord or the taking authority for the value of any unexpired portion of the term of this Lease and rent shall be adjusted to the date of such termination. Landlord agrees to give Tenant notice in writing of a proposed exercise of power of eminent domain promptly after learning of the same. If this Lease is terminated as a result of exercise of the power of eminent domain, Landlord shall be entitled to the entire award or compensation in such proceedings, but the rent and other charges for the last month of Tenant's occupancy shall be prorated and Landlord agrees to refund to Tenant any rent or other charges paid in advance. If both Landlord and Tenant elect not to terminate this Lease in the event of a partial taking, Tenant shall remain in that portion of the Premises which has not been taken. Thereafter the Minimum Rent provided for in Article 2.2 hereof shall be reduced on an equitable basis, taking into account the relative value of the portion taken as compared to the portion remaining.

20.3    **Total or Partial Condemnation of the Parking Areas**. If the whole or a substantial percentage of the parking areas of the Shopping Center is taken through exercise of the power of eminent domain, this Lease shall terminate as of the date title vests in the taking authority, unless Landlord shall provide other parking facilities substantially equal to the previously existing ratio between the parking area and the Premises within ninety (90) days from the date of acquisition by the taking authority. If Landlord provides such other substantially equal parking facilities, this Lease shall continue in full force and effect without any reduction or abatement of rent and all costs and expenses for maintenance and repair for such parking will be paid by Tenant as provided for in Article 3.

20.4    **Landlord's and Tenant's Damages**. The entire award made as a result of any taking through exercise of the power of eminent domain, whether for the whole or a part of the Premises, shall belong to and be the property of Landlord whether such award shall be as compensation for diminution in value to the leasehold or to the fee of the Premises, and Tenant shall have no claim against either Landlord or the taking authority with respect thereto. Tenant agrees to execute an assignment of any award made for such a taking when requested by Landlord.

20.5    **Exclusive Remedies**. Notwithstanding any taking by condemnation of the Premises, the Shopping Center and/or the Common Area, Tenant shall not be released from any of its obligations under

EXHIBIT A

this Lease, except to the extent and upon the conditions expressly stated in this Article 20.  Tenant hereby expressly waives the provisions of California Code of Civil Procedure Section 1265.130 with respect to any taking by condemnation of the Shopping Center and/or the Premises and agrees that the provisions of this Article 20 shall exclusively govern its rights.

ARTICLE 21
DEFAULT

The occurrence, at any time during the Term of this Lease, of any of the following shall constitute a default and material breach of this Lease by Tenant:

(a)    If Tenant fails to pay Rent or any other sum required to be paid under this Lease, or any part thereof, when the same is due and payable as provided herein for a period of three (3) days after written notice of such failure is given by Landlord;

(b)    If Tenant fails to move into the Premises and to commence the conduct of its business on the date specified in Article 7 hereof;

(c)    If Tenant abandons or vacates the Premises;

(d)    If Tenant attempts to hypothecate, transfer, assign, sublet or permit persons other than Tenant to occupy the Premises or any part thereof or interest therein in violation of Article 17 above:

(e)    If Tenant shall become bankrupt or insolvent or make a transfer in fraud of creditors, or make an assignment for the benefit of creditors, or if a receiver or trustee is appointed for all or a substantial portion of Tenant's properties or takes or has taken against Tenant any proceeding of any kind under any provision of the Federal Bankruptcy Code or under any other federal or state insolvency, bankruptcy, reorganization or similar act, in which case the provisions of Article 23 hereof shall control;

(f)    Landlord's discovery of the material falsity of any financial statement of Tenant or any guarantor of this Lease, if any, given to Landlord to induce it to enter into this Lease;

(g)    If Tenant fails to perform or observe any other of the terms, conditions or covenants of this Lease to be performed or observed by Tenant, and such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant; provided however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said thirty (30) day period and thereafter diligently and in good faith prosecutes such cure to completion.

The notices required pursuant to clauses (a) and (g) above may be satisfied by any notices required by Section 1161, et seq., of the California Code of Civil Procedure.  Accordingly, provided Tenant fails to timely cure or correct the default specified in the notice by Landlord pursuant to clauses (a) and (g) above, Tenant acknowledges and agrees that Landlord need not give further notice to Tenant prior to institution of unlawful detainer proceedings.

ARTICLE 22
REMEDIES IN DEFAULT

22.1    **Remedies**.  In the event of a default by Tenant, Landlord, in addition to any other remedies available to it at law or in equity, at its option, may: (i) recover and resume possession of the Premises and remove all persons and property therefrom, in which case this Lease shall terminate and Tenant shall have no further claim hereunder, or (ii) continue this Lease in full force and effect for so long as it does not terminate Tenant's right to possession, in which case Landlord may enforce all of its rights and remedies hereunder, including the right to recover rent and other charges required to be paid by Tenant as they become due, and subject to Article 22.4 hereof, relet the Premises on behalf of the Tenant.

22.2    **Recovery of Damages**.  In the event Landlord terminates this Lease as provided in Article 22.1, it shall be entitled to recover as damages all of the following:

(a)    The worth at the time of the award of any unpaid Rent or other charges which had been earned at the time of termination;

(b)    The worth at the time of the award of the amount by which the unpaid Rent and other charges which would have been earned after termination until the time of the award exceeds the amount of the loss of such Rent or other charges that Tenant proves could have been reasonably avoided;

(c)    The worth at the time of the award of the amount by which the unpaid Rent and other charges for the balance of the Term after the time of the award exceeds the amount of the loss of such Rent and other charges that Tenant proves could have been reasonably avoided:

EXHIBIT A

(d)    Any other amount necessary to compensate Landlord for the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom; and

(e)    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable California law.  All Rent and other charges other than Minimum Rent shall be computed on the basis of the average monthly amount thereof accruing during the sixty (60) month period immediately preceding default unless a sixty (60) month period of this Lease has not elapsed, in which case the average monthly amount shall be based upon the entire period of Tenant's occupancy of the Premises.  In the event of default, all of Tenant's fixture, furniture, equipment, improvements, additions, alterations and other personal property shall remain on the Premises, and during the period of such default Landlord shall have the right to take exclusive possession of the same and to use the same free of charge until all defaults are cured, or at its option to require Tenant to remove the same forthwith or declare title to the property to be vested in Landlord as provided in Article 10.3 hereof.  As security for Tenant's compliance with all terms of this Lease, Landlord is hereby given a lien on all of Tenant's property in, upon or about the Premises.

22.3    **Worth at the Time of the Award**.  As used in subparagraphs (a) and (b) of Article 22.2, the "worth at the time of the award" shall be computed by allowing interest in maximum amount permitted by law.  As used in subparagraph (c) of Article 22.2, the "worth at the time of award shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%).  The amount recoverable by Landlord pursuant to subparagraph (d) of Article 22.2 shall include, but shall not be limited to, any costs or expenses incurred by Landlord in maintaining or preserving the Premises after such default, reletting the Premises to a new tenant, preparing the Premises for such reletting, accomplishing any repairs or alterations to the Premises for the purpose of such reletting, rectifying any damage thereto occasioned by the act or omission of Tenant and any other cost necessary or appropriate to relet the Premises including real estate commissions and advertising expenses.

22.4    **Landlord's Right to Relet**.  During the period Tenant is in default, Landlord can enter the Premises and relet them, or any part of them, to third parties for Tenant's account.  In addition to the foregoing, Tenant shall be liable immediately to Landlord for all costs incurred by Landlord in reletting the Premises, such as those described in Article 22.3 hereof, and like costs.  Reletting can be for a period shorter or longer than the remaining Term of this Lease.  Tenant shall pay to Landlord the Rent due under this Lease on the date rent is due, less the Rent Landlord receives from reletting.

22.5    **Tenant's Right to Possession**.  Tenant's right to possession shall not be deemed to have been terminated by the efforts of Landlord to relet the Premises, by its acts of maintenance or preservation with respect to the Premises, or by appointment of a receiver to protect Landlord's interest hereunder.  No act of Landlord other than giving notice of termination or forfeiture will terminate or forfeit this Lease.  The foregoing enumeration is not exhaustive, but merely illustrative of acts, which may be performed by Landlord without terminating Tenant's right to possession.

22.6    **Waiver of Redemption**.    Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future law in the event Tenant is evicted or dispossessed for any cause or in the event Landlord obtains possession of the Premises as a result of the violation by Tenant of any of the covenants or conditions of this Lease or otherwise.

ARTICLE 23
BANKRUPTCY OR INSOLVENCY

Neither Tenant's interest in this Lease, nor any interest herein of Tenant nor any estate hereby created in Tenant shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law.  In the event Tenant, or a Guarantor of this Lease, shall become bankrupt or insolvent, or make a transfer in fraud of creditors, or make an assignment for the benefit of creditors, or take or have taken against Tenant, or the Guarantor, any proceeding of any kind under any provision of the Federal Bankruptcy Code or under any other federal or state insolvency, bankruptcy, reorganization or similar act or if a receiver or trustee is appointed for a substantial portion of Tenant's or Guarantor's assets, this Lease shall immediately terminate and be of no further force or effect whatsoever, without the necessity for any further action by Landlord, except that Tenant or its Guarantor, shall not be relieved of obligations which have accrued prior to the date of such termination.   Upon such termination the provisions herein relating to the expiration or earlier termination of this Lease shall control and Tenant shall immediately surrender the Premises in the condition required by the provisions of this Lease.  Additionally, Landlord shall be entitled to all relief, including recovery of damages from Tenant, and its Guarantor, which may from time to time be permitted, or recoverable, under the Federal Bankruptcy Code or any other applicable laws.  Notwithstanding the foregoing, the termination of this Lease by reason of the bankruptcy or insolvency of the Tenant shall not in any way be construed in relieving Tenant's Guarantor of its obligations under the Guaranty.

ARTICLE 24
ACCESS BY LANDLORD

Tenant agrees to permit Landlord and its authorized representatives to enter the Premises at all reasonable times, including without limitation usual business hours, for the purpose of (a) inspecting the

same, (b) posting notices of non-responsibility, (c) showing the Premises to prospective purchasers, lenders or tenants of the Premises of the Shopping Center, (d) determining whether Tenant is complying with all of its obligations hereunder, (e) to cure defaults of Tenant hereunder, including without limitation the abatement of any unauthorized use of the Premises or any nuisance or waste therein and (f) removing from the Premises any improvements or other property, including signs, placed therein in violation of this Lease.  Tenant further agrees that Landlord may go upon the Premises and make any necessary repairs thereto and perform any work therein which may be necessary due to Tenant's failure to comply with the provisions of this Lease, to comply with any laws, ordinance, rules and regulations of any public authority, to maintain and to make repairs to the Premises or to adjoining space or utility services or to make repairs, alterations or additions to the Shopping Center that Landlord may deem necessary to prevent waste, nuisance, or deterioration in the Premises if Tenant does not make or cause such repairs to be made or performed or cause such work to be performed promptly after receipt of written demand from Landlord.  Tenant agrees that Landlord shall have no liability to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixtures or other property or to Tenant's business by reason of Landlord's entry upon the Premises or performance of work in the Premises as provided above.  Tenant hereby grants to Landlord such licenses or easements in or over the Premises or any portion thereof as shall be reasonably required for the installation or maintenance of mains, conduits, pipes or other facilities to serve any portion of the Shopping Center.

ARTICLE 25
HOLDING OVER

If Tenant holds the Premises after the expiration of the Term or earlier termination of this Lease, such holding over, in the absence of written agreement on the subject shall be deemed to have created a month-to month tenancy terminable upon thirty (30) days prior written notice given at any time by either party to the other and, except as provided below, shall be otherwise subject to all of the terms, conditions and covenants of this Lease.  Rent shall be paid monthly and shall be computed on the basis of 200% times the Minimum Rent due immediately prior to the end of the Term or earlier termination of this Lease plus one-twelfth (1/12) of all other charges, payable by Tenant to Landlord for the immediately preceding twelve month period.  Acceptance of Rent and other charges by Landlord after the expiration or earlier termination of this Lease shall not constitute consent to a holdover or result in a renewal except as otherwise expressly provided by the parties in writing.  If Tenant fails to surrender the Premises on the expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall indemnify and hold Landlord harmless from all loss or liability resulting from such failure, including without limitation any claims made by any succeeding Tenant founded upon such failure.  The provisions of this Article 25 are in addition to and do not affect Landlord's right or Tenant's obligations under this Lease.

ARTICLE 26
QUIET ENJOYMENT

Upon payment by Tenant of the Rent and other charges herein provided, and upon the full and timely observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to the terms, conditions and covenants of this Lease.

ARTICLE 27
MISCELLANEOUS

27.1    **Waiver**.  No purported waiver by Landlord of any default by Tenant of any term, condition or covenant contained herein shall be deemed to be a waiver of such term, condition or covenant unless the waiver is in writing and signed by Landlord. No such waiver shall in any event be deemed a waiver of any subsequent default under the same or any other term, condition or covenant contained herein.  Landlord's acceptance of Rent or other charges following a default hereunder by Tenant shall not be deemed a waiver of such default or of any earlier default by tenant of any term, condition or covenant of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such default at the time of such acceptance.  The consent or approval by Landlord to or of any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive the requirement of Landlord's consent or approval to or of any subsequent or similar acts by Tenant.

27.2    **Accord and Satisfaction**.  No payment by Tenant or receipt by Landlord of a lesser amount than the Rent and other charges herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent or other charge, nor shall any endorsement or statement on any check or any letter accompanying a check or payment as Rent or other charges be deemed an accord or satisfaction.  Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or other charge or pursue any other remedy in this Lease.

27.3    **Entire Agreement**.  This Lease and the Exhibits attached hereto set forth the entire understanding between Landlord and Tenant concerning the Premises and incorporate all prior negotiations and understandings.  The parties hereto agree that there are no covenants, promises, agreements, conditions or understandings, either oral or written, whatsoever between the parties hereto with respect to any subject covered by this Lease other than those set forth herein.  No alteration,

EXHIBIT A

amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by the party to be charged. The parties hereto acknowledge and agree that each has participated in the negotiation and drafting of this Lease; therefore, in the event of an ambiguity in, or dispute regarding the interpretation of, this Lease, the interpretation of this Lease shall not be resolved by any rule of interpretation providing for interpretation against the party who caused the uncertainty to exist or against the draftsman. Any deletion of language from this Lease prior to its execution by Landlord and Tenant shall not be construed to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse of the deleted language.

27.4    **No Partnership**. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture, and neither the method of computation of Rent nor any other provision contained in this Lease nor any act of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

27.5    **Successors**. Each and all of the provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto, and except as otherwise specifically provided in this Lease, their respective heirs, executors, administrators, successors and assigns, subject at all times, nevertheless, to all agreements and restrictions contained elsewhere in this Lease with respect to the hypothecation, assignment, transfer, encumbering or subletting of all or any part of Tenant's interest in this Lease or the occupancy of the Premises by anyone other than Tenant.

27.6    **Force Majeure**. In the event that either party hereto is delayed or hindered from the performance of any act required hereunder by reason of fires, earthquakes, floods, hurricanes, explosions, the elements, strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, failure to obtain governmental approvals or permits, riots, insurrection, act of God, war or other reasons of a like nature not the fault of such party, then performance of such acts shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Article shall not, however, operate to excuse Tenant from prompt payment of Rent or any other payment of money required by the terms of this Lease.

27.7    **Attorney's Fees**. If during the Term of this Lease, Landlord or Tenant institutes any action or proceeding against the other relating to the provisions of this Lease or any default hereunder, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the reasonable expenses of such action, including reasonable attorneys' fees and disbursements incurred by the successful party, regardless of whether the action or proceeding is prosecuted to judgment.

27.8    **Notices**. Any notice, approval, demand, request or other communication required or permitted to be given under this Lease shall be in writing and shall be delivered in person or sent by United States certified or registered mail, return receipt requested, postage prepaid and shall be addressed to Landlord or Tenant at the respective addresses given below or at such other address or addresses last make known to the parties in writing. Either party may change its address for notices by notice in the manner set forth above. All notices that are mailed as provided above shall be deemed fully given twenty-four (24) hours after the same have been deposited in the mail as provided herein. Any notices should be sent to the addresses as specified in Article 2.11.

27.9    **Captions and Section Numbers**. The captions, article numbers, and indices appearing in this Lease are inserted only as a matter of convenience. They do not define, limit, construe, or describe the scope or intent of the provisions of the Lease.

27.10    **Tenant Defined, Use of Pronouns**. The word "**Tenant**" shall mean each person or party mentioned as Tenant herein, and if there shall be more than one Tenant, (a) any notice required or permitted by this Lease may be given by or to any one hereof, and shall have the same force and effect as if given by or to all thereof and (b) the act or signature of any one or more of them with respect to this Lease shall be binding upon each and all of the persons and entities executing this Lease as Tenant with the same force and effect as if each and all of them had so acted or signed. The use of the neuter, singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, or a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or Tenant and to corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed.

27.11    **Broker's Commission**. Except as otherwise specifically acknowledged, each party represents and warrants to the other that it has taken no act nor permitted any act to be taken pursuant to which it or the other party hereto might incur any claim for brokerage commissions or finder's fees in connection with the execution of this Lease other than the claims of West Coast Retail Management, Inc. and Cassidy Turley/BRE Commercial representing Landlord only. Each party agrees to indemnify, defend and hold harmless the other against all liabilities and costs arising from a breach of such representation and warranty, including, without limitation, for attorneys' fees and disbursements in connection herewith.

EXHIBIT A

27.12  **Partial Invalidity**.  If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid shall both be unaffected thereby, and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

27.13  **Sale of the Premises**.  In the event of any sale, exchange, or other transfer of the Shopping Center or Premises by Landlord or an assignment by Landlord of this Lease (including in a so-called "sale-leaseback" transaction),  Landlord shall automatically be relieved of any and all obligations on the part of Landlord accruing from and after the date of such sale or assignment, including, but not limited to, any obligation to Tenant with respect to the Security Deposit referred to in Article 5 of this Lease upon assignment of same to the transferee, provided that (a) the interest of the transferor, as Landlord, in any funds then in the hands of Landlord in which Tenant has an interest shall be turned over, subject to such interest, to the transferee and (b) notice of such sale, transfer or lease shall be delivered to Tenant as required by law.  No holder of a mortgage, deed of trust or ground or underlying lease to which this Lease is or may be subordinate shall be responsible in connection with the security deposited hereunder, unless such mortgagee or holder of such deed of trust or lessor shall have actually received such security.

27.14  **Recording**.  This Lease shall not be recorded, but if Landlord so requests Tenant agrees to execute, acknowledge and deliver a memorandum of this Lease in recordable form which Landlord may thereafter file for record.  Said memorandum shall describe the parties, the Premises and the term of this Lease, shall state that it is subordinate to mortgages, deeds of trust and ground and underlying leases as provided in Article 16.2 hereof and shall incorporate this Lease by reference.  Upon the expiration or termination of this Lease, Tenant agrees to execute and deliver, in recordable form, any instruments which Landlord may request, including without limitation a quitclaim deed, in order to remove evidence of this Lease from the Shopping Center's record of title.

27.15  **Furnishing of Financial Statement**.  Upon Landlord's written request, Tenant shall promptly furnish Landlord, from time to time, with financial statements certified by Tenant to be true and correct, reflecting Tenant's then current financial condition.  The financial statements shall include a current balance sheet and a profit and loss statement for the most recent twelve (12) month period available (but ending no earlier than six (6) months from the date of the request).

27.16  **Landlord's Use of Common Area**.  Landlord reserves the right, from time to time, to utilize portions of the Common Area for entertainment, outdoor shows, displays, automobile and other product shows, the leasing of kiosks, or such other uses which, in Landlord's judgment, tend to attract the public.  Further, Landlord reserves the right to utilize the lighting standards and other areas in the parking lot for advertising purposes.

27.17  **Execution of Lease**.  The submission of this Lease to Tenant for examination or execution does not constitute a reservation of or option on the Premises or an agreement of Landlord to lease the Premises.  This Lease shall become effective as Lease, and Landlord shall become obligated hereunder only upon the execution and delivery of this Lease by Landlord and Tenant.

27.18  **Governing Law**.  This Lease shall be governed by and construed in accordance with the laws of the State of California.

27.19  **Duplicate Originals**.  This Lease may be executed in any number of duplicate originals, each of which when fully executed by Landlord and Tenant shall be deemed an original and all of which together shall be deemed the same lease.

27.20  **Remedies Cumulative**.  The various rights, options, elections, powers and remedies contained in this Lease shall be construed as cumulative and no one of them shall be exclusive of any of the others or of any other legal or equitable remedy which either party might otherwise have in the event of a breach or default in the terms hereof.  The exercise of one right or remedy by such party shall not impair its right to any other right or remedy until all obligations imposed on the other party have been fully performed.

27.21  **Consent**.  Except as provided to the contrary herein, whenever in this Lease Landlord or Tenant is required to give its consent or approval to any action on the part of the other, such consent or approval shall not be unreasonably withheld.  The consent or approval of Landlord to or of any act or request by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary the consent to or approval of any subsequent similar acts or requests.  In the event of the unjustified failure to give any such consent, the other party hereto shall be entitled to specific performance at law and shall have such other remedies as are reserved to it under this Lease, but in no event shall Landlord or Tenant be responsible in monetary damages for such failure to give consent unless said consent is withheld maliciously or in bad faith.

27.22  **Tenant's Business and Other Tenants in Shopping Center**.  Tenant hereby acknowledges that at no time has Landlord made any representations with respect to the prospects or nature of the business or trade it would conduct at the Premises or with respect to the identity, business, type, or number of other tenants or persons to occupy premises in the Shopping Center, and Tenant agrees that it is not entering into this Lease in reliance on said prospects or nature or on the identity, business, type or number of other tenants or persons to occupy premises in the Shopping Center.

Tenant further acknowledges that Landlord has made no covenant or warranty, expressed or implied, to the effect that Landlord has entered into a lease, will enter into a lease, or will continue to maintain a lease with any particular tenant, type of tenant or number of tenants. Tenant shall have no right to terminate this Lease or to an abatement of the Rent or other charges due hereunder in the event one or more businesses located in the Shopping Center now or in the future cease to do business in the Shopping Center.

27.23    **Returned Checks**. If Tenant pays any installment or Rent by check and such is returned for insufficient funds or other reasons not the fault of the Landlord, then Tenant shall pay Landlord, on demand, a processing fee of One Hundred Dollars ($100.00) per returned check plus all applicable late charges and all subsequent payments to Landlord by Tenant shall be in either a certified or cashier's check

27.24    **Interest on Tenants Obligations**. Tenant agrees that any payment due from Tenant to Landlord which is not paid when due shall bear interest from the due date to the date of payment at the maximum lawful rate; however, such payment of interest shall not be construed as a waiver by Landlord of Tenant's obligations hereunder regarding timely payment of sums due nor shall such payment of interest cure or excuse any breach or default hereunder. In addition to such interest, Tenant agrees to pay a late charge equal to five percent (5%) of any installment of Minimum Rent, Percentage Rent, or Additional Charges or other sums payable hereunder by Tenant, which has not been paid within five (5) days after amount was due, which sums Landlord and Tenant agree represent a reasonable approximation of Landlord's additional expenses resulting from Tenant's failure to make payment when due, which expenses the parties hereto agree are and will be difficult and impracticable to determine.

Should Landlord fail to receive when due any installment of Rent or any other sum payable to Landlord under the terms of this Lease, then Landlord shall, in addition to the interest provisions of this Article 27.24, assess a servicing fee of Seventy Five and 00/100 Dollars ($75.00) per month from and after the fifth (5th) day following the date on which any sum shall be due and payable until the required payments are made.

27.25    **No Merger**. The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, shall not work a merger, and shall, at the option of Landlord, terminate all or any existing subleases or subtenancies, or may, at the option of Landlord, operate as an assignment to it of Tenant's interest in any or all subleases or subtenancies.

27.26    **Landlord's Liability**. Any provision in this Lease to the contrary notwithstanding, Tenant hereby agrees that no personal, partnership or corporate liability of any kind or character now attaches or at any time hereafter under any condition shall attach to Landlord for payment of any amounts payable or to become payable under this Lease or for the performance of any obligation under this Lease. In the event of any actual or alleged failure, breach or default hereunder by Landlord, the sole and exclusive remedy of Tenant shall be to proceed against the interest of Landlord in the Shopping Center.

27.27    **Authority**.

(a)    If Tenant is a corporation or limited liability company, Tenant and each individual executing this Lease on behalf of Tenant does hereby represent and warrant that Tenant is duly organized, validly existing and in good standing under the laws of the State of California and has all requisite power and authority to own, lease, hold and operate properties and conduct business in the State of California.

(b)    If Tenant is a corporation, each individual executing this Lease on behalf of Tenant represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the corporation, in accordance with a duly adopted resolution of the Board of Directors of the corporation or in accordance with the Bylaws of the corporation, and that this Lease is binding upon said corporation in accordance with its terms.

(c)    If Tenant is a limited liability company, each individual executing this Lease on behalf of Tenant represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the limited liability company, in accordance with a duly adopted resolution of the members of the limited liability company or in accordance with the operating agreement of the limited liability company, and that this Lease is binding upon said limited liability company in accordance with its terms.

(d)    If Tenant is a partnership, each individual executing this Lease represents that he or she is duly authorized to execute and deliver this Lease on behalf of such partnership, that the persons who have executed this Lease constitute all of the partners of the partnership that there are no persons who are partners of the partnership who have not executed this Lease and that this Lease is binding on such partnership in accordance with its terms, conditions and covenants of this Lease and shall, upon Landlord's request, execute and deliver the form of assumption agreement as Landlord may reasonably require.

(e)    If Tenant is an individual or individuals, each individual executing this Lease represents that he or she is duly authorized to execute and deliver this Lease on behalf of such individual(s) and that this Lease is binding on such individual(s) in accordance with its terms.

EXHIBIT A

(f)     If more than one person or entity executes this Lease as Tenant: (a) each of them is and shall be jointly and severally liable for the covenants, conditions, provisions and agreements of this Lease to be kept, observed and performed by Tenant; and (b) the act or signature of, or notice from or to, any one or more of them with respect to this Lease shall be binding upon each and all of the persons and entities executing this Lease as Tenant with the same force and effect as if each and all of them had so acted or signed, or given or received such notice.

27.28   **Exhibits.**  Any and all of the Exhibits listed in Article 2.12 are made a part of this Lease and are incorporated herein by this reference.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the year and date first above written.

LANDLORD                                          TENANT

SunBrewer Partners, L.P.,
a California limited partnership

By:    Marusan U.S.A., Inc.,                      SYDNEY NGUYEN
       a California corporation                   Social Security No.: _
       (Sole General Partner)

       By: _____
           Name: Hiroyasu Nakano                  YUMI BUI
           Title:   President                      Social Security No.: _

EXHIBIT A

**RANCHO PENASQUITOS PLAZA**

**ADDENDUM TO LEASE**

This Addendum to Lease ("Addendum") is made to the Lease dated as of _____, 2011 ("Lease"), by and between *SunBrewer Partners, L.P., a California limited partnership* ("Landlord") and *Sydney Nguyen and Yumi Bui, husband and wife,* dba *Saigon Noodles* ("Tenant").

Landlord and Tenant hereby agree that notwithstanding anything contained in the Lease to the contrary, the provisions set forth below shall be deemed to be a part of the Lease and shall supersede, to the extent appropriate, any contrary provision in the Lease. All references in the Lease and in this "Addendum to Lease" shall be construed to mean the Lease as amended and supplemented by this Addendum. All capitalized terms used in this Addendum unless specifically defined in this Addendum shall have the same meaning as the terms used in the Lease.

**AGREEMENT**

1.    **Option to Extend**.  Provided Tenant is not then in default with respect to this Lease and has kept and performed all of its obligations under this Lease, Tenant shall have the right and option ("**Option**") at any time, no later than six (6) months but no earlier than nine (9) months before the expiration of the initial Term of this Lease, to extend the initial Term of this Lease for one (1) additional term(s) of three (3) years from the date of expiration of the initial Term (the "**Extended Term**"), which notice of exercise of option shall only be effective if in writing and sent to the Landlord as provided in this Lease for the mailing of notices.  Provided, however, that Tenant may not exercise this right if (i) Tenant has received three (3) or more notices of default throughout the initial Term, whether or not those defaults were cured, (ii) at any time when Tenant has breached and not cured or is in default under this Lease, or (iii) at no time during the Term shall Tenant have been delinquent in the payment of any amount due under the Lease for more than ten (10) days in two (2) separate instances.  Should Tenant breach or default under this Lease at any time after giving notice of extension and prior to the first day of the Extended Term, Landlord shall have the right to declare Tenant's notice void and of no effect, and the Term of this Lease shall expire as if notice had not been given.

In the event that Tenant timely exercises its Option as to any Extended Term, then the initial Term shall be extended through the end of such Extended Term (subject to earlier termination pursuant to the provisions of this Lease) and this Lease shall continue in full force and effect without modification, except that the Minimum Rent payable for the first year of the Extended Term shall be adjusted to an amount equal to the greater of (i) the fair rental value for the Premises as determined pursuant to the following paragraph, or (ii) one hundred three percent (103%) of the Minimum Rent in effect immediately prior to the commencement of the Extended Term.  Notwithstanding anything contained in this paragraph, in no event shall the Minimum Rent for the Extended Term be less than item (ii) in the preceding sentence.  After the Minimum Rent for the first year of any Extended Term has been established, the Minimum Rent shall thereafter be increased in accordance with Article 3.1 of this Lease.

If the parties are unable to agree on the Minimum Rent for any Extended Term within sixty (60) days following Tenant's notice of its exercise of its Option with respect to such Extended Term, then the Minimum Rent for the first year of such Extended Term shall be determined by arbitration as follows: Within fifteen (15) days after the expiration of such 60 day period, each party shall appoint as an arbitrator a duly qualified real estate broker with a reputable brokerage firm who has at least five (5) years experience in leasing and selling retail properties.  Within fifteen (15) days after their appointment, the two arbitrators so appointed shall appoint a third person similarly qualified to act as the third arbitrator.  If the two arbitrators appointed by the parties are unable to agree on the third arbitrator, then the parties (or either of them) shall diligently apply to the Presiding Judge of Superior Court in the State of California, County of San Diego, for the appointment of such person.  Within thirty (30) days after appointment of the third arbitrator, the three arbitrators shall determine the fair market rental for the space taking into account the terms of this Lease, the location of the Shopping Center and its major co tenants, and the market rental value of similar space within the Shopping Center, and the amount so determined shall be used as the basis for a computation by them of the Minimum Rent hereunder.  In the event the arbitrators are unable to reach a unanimous agreement, the vote of two shall control and the decision of the arbitrators shall be final and binding upon the parties hereto.  Landlord and Tenant shall each bear one-half of the cost of any such arbitration.

In the event the Minimum Rent for the first year of any Extended Term has not been finally determined as of the commencement of the Extended Term, Tenant shall continue to pay the Minimum Rent payable during the last year of the initial Term and within 30 days following determination of the new Minimum Rent, Tenant shall pay to Landlord the amount necessary to make up any deficiency between the amount theretofore paid by Tenant as Minimum Rent for the Extended Term and the actual Minimum Rent payable for such period.  Any Security Deposit held by Landlord shall be increased in the ratio as the Minimum Rent is increased in the first year of the Extended Term divided by the Minimum Rent for the first year of the initial Term.  Upon default in payment of the full increase in rental provided for above, Landlord shall have the same rights and remedies as upon default in the rent otherwise provided for in the Lease.

EXHIBIT A

This Option may be exercised only by the original Tenant while physically occupying the Premises and any consent by Landlord to assignment or sublease of the Premises shall not be construed as a waiver of this prohibition.

2.      **Minimum Rent**.  Minimum Rent shall be as follows:

| MONTH OF TERM | MINIMUM RENT MONTHLY | MINIMUM RENT ANNUALLY |
|---|---|---|
| 1-12* | $4,187.50** | $50,250.00** |
| 13-24 | $4,313.13 | $51,757.56 |
| 25-36 | $4,442.52 | $53,310.24 |
| 37-48 | $4,575.79 | $54,909.48 |
| 49-60 | $4,713.07 | $56,556.84 |
| 61-72 | $4,854.46 | $58,253.52 |
| 73-84 | $5,000.09 | $60,001.08 |
| 85-90 | $5,150.10 | $61,801.20 |

*Plus any partial month at the beginning of the Term if the Commencement Date does not fall on the first day of a month.
** Provided that Tenant faithfully performs all of the terms and conditions of this Lease, Landlord hereby agrees to abate Tenant's obligation to pay Minimum Rent for the first three (3) full calendar months of the initial Term.  During such abatement period, Tenant shall still be responsible for the payment of all of its other monetary obligations under the Lease.  In the event of a default by Tenant under the terms of the Lease that results in early termination pursuant to the provisions of Section 22.1 of the Lease, then as a part of the recovery set forth in Section 22.2 of the Lease, Landlord shall be entitled to the recovery of the Minimum Rent that was abated under the provisions of this paragraph.

3.      **Landlord's Right to Cancel Lease.**  Landlord and Tenant agree that the following terms, conditions and provisions shall apply to matters arising from or related to Landlord's right to cancel this Lease, as discussed below:

A.      **Landlord's Right to Cancel Lease**.  Notwithstanding anything contained in this Lease to the contrary, Landlord shall have the continuing right to cancel this Lease at anytime following the Commencement Date ("Cancellation Right") in accordance with the provisions set forth below.

B.      **Notice/Effective Date**.  If Landlord elects to exercise the Cancellation Right, Landlord shall provide Tenant with written notice thereof ("Cancellation Notice"), at least thirty (30) days prior to the effective date of such cancellation ("Cancellation Date") specified in the Cancellation Notice.

C.      **Delivery of the Premises**.  On the Cancellation Date, Landlord and Tenant shall be relieved of all obligations pursuant to this Lease except for obligations which have accrued prior to the Cancellation Date or those obligations which by the terms of this Lease survive cancellation.  On the Cancellation Date, Tenant will deliver possession of the Premises to Landlord in accordance with the provisions of this Lease as if the Cancellation Date were the expiration date of this Lease.  Landlord shall, upon reasonable notice to Tenant, have the right to enter upon and show the Premises to prospective tenants after the date of the Cancellation Notice.

4.      **Confidentiality**.  Tenant hereby represents and warrants that it and its representatives, servants, agents and employees ("Agents") shall make a good faith effort to keep the terms and provisions of this Lease strictly confidential throughout the term of the Lease, except to the extent necessary: (a) to carry out the purpose of the Lease; (b) in connection with any administrative or judicial proceeding in which Tenant is involved and required to divulge such information; (c) to disclose information to Tenant's attorneys, accountants, and advisors; (d) in connection with any SEC or other similar filings by Tenant; or (e) if required in good faith for financing or accounting reasons.  If Tenant or any of its Agents violate this provision, Tenant shall indemnify Landlord for all of Landlord's costs, expenses, liabilities, and damages related thereto including without limitation, the reasonable costs of legal counsel, investigation costs and court costs.

5.      **Permit Contingencies**.  Tenant shall exercise its best efforts to obtain all necessary permits for the Permitted Use (the "**Permits**") as soon as possible after the date of this Lease, and shall, in any event, submit all necessary applications and submittals for the Permits to the appropriate governmental agencies no later than fifteen (15) days following the date of this Lease.  Tenant shall keep Landlord fully apprised of the status of the issuance of the Permits.  If the Permits have not been issued

EXHIBIT A

within sixty (60) days following the date of this Lease (for any reason, including that any conditions imposed on the issuance of the Permits is cost prohibitive, as reasonably determined by Tenant), Landlord may (without limiting any other remedy Landlord may have hereunder if the non-issuance of the Permits is due to Tenant's default hereunder) terminate this Lease by giving Tenant written notice thereof at any time prior to the issuance of the Permits.  In addition, if the Permits are not issued by such date and the reason therefor is not due to Tenant's failure to timely submit all necessary applications and submittals or exercise its best efforts to obtain the Permits, Tenant may terminate this Lease by giving Landlord written notice thereof within ten (10) days following such date.  Tenant's failure to timely deliver such termination notice shall be deemed to be Tenant's election to continue this Lease in full force and effect and Tenant's termination right under this Section 5 shall be null and void.

6.    **Effectiveness of Lease**.  Except as and to the extent modified by this Addendum, all provisions of the Lease shall remain in full force and effect.

LANDLORD

SunBrewer Partners, L.P.,
a California limited partnership

By:    Marusan U.S.A., Inc.,
       a California corporation
       (Sole General Partner)

       By:    _____
              Name: Hiroyasu Nakano
              Title:  President

TENANT

_____
SYDNEY NGUYEN
Social Security No.: ___

_____
YUMI BUI
Social Security No.: _    ____

P:00608461:12005.018                                    -3-

Exhibit A

SITE PLAN



EXHIBIT A

Exhibit B

TENANT IMPROVEMENT AGREEMENT

(Tenant to Construct)

Landlord and Tenant are executing simultaneously with this Tenant Improvement Agreement ("Agreement"), a written lease ("Lease") covering those certain premises more particularly described in Exhibit "A" (Site Plan) to the Lease ("Premises"), in the Shopping Center more particularly described in the Lease. Landlord and Tenant agree that Tenant shall improve and prepare the Premises for Tenant's occupancy, on the terms and conditions set forth in this Agreement. To induce Landlord and Tenant to enter into the Lease and in consideration of the mutual covenants hereinafter contained, Landlord and Tenant mutually agree as follows:

1.  **General**. The purpose of this Agreement is to set forth how the interior improvements in the Premises as set forth in the Construction Documents, as defined below in Article 7 below, are to be constructed, who will be responsible for the construction of the Tenant Improvements, and the time schedule for the construction and completion of the Tenant Improvements.

2.  **Defined Terms**. Except as defined in this Agreement to the contrary, all terms utilized in this Agreement shall have the same meaning as the defined terms in the Lease.

3.  **Incorporation of Lease**. The provisions of the Lease, except where clearly inconsistent or inapplicable to this Agreement, are hereby incorporated into this Agreement.

4.  **Tenant Improvement Plans**. Tenant shall retain either a licensed architect or space planner (hereinafter "Space Planner") to prepare a preliminary space plan layout and improvement plans ("Space Plan") to be utilized in the preparation of final working drawings and specifications for the improvements to the Premises to be performed by Tenant ("Tenant Improvements"). Tenant's selection of Space Planner shall be subject to the prior written approval of Landlord, which approval shall not be unreasonably withheld or delayed.

5.  **Space Plan**. If Tenant has not previously delivered a Space Plan to Landlord prior to the date of this Agreement, Tenant shall, within ten (10) days after the date of this Agreement, deliver the Space Plan to Landlord. The Space Plan shall show the configuration of the proposed Tenant Improvements and contain a "finish schedule" and all information necessary for Tenant to have the mechanical, electrical and engineering drawings (collectively "Engineering Plans") prepared at Tenant's expense, the cost of which will be deducted from the Tenant Improvement Allowance. Such information submitted as part of the Space Plan shall be in sufficient detail to show locations, types and requirements for all heat loads, people loads, floor loads, power and plumbing, regular and special HVAC needs, telephone communications, telephone and electrical outlets, lighting, light fixtures and related power, and electrical and telephone switches. Landlord shall approve, or disapprove for reasonable reasons, the Space Plan within five (5) business days after Landlord receives the completed Space Plan and, if disapproved, Landlord shall return the Space Plan to Tenant, who shall make all necessary revisions within five (5) business days after Tenant's receipt thereof. This procedure shall be repeated until Landlord ultimately approves the Space Plan. When approved, the Space Plan, as modified, shall be deemed the "Final Preliminary Plans."

6.  **Engineering Plans**. If required by applicable building regulations, Tenant shall select as the mechanical and electrical engineer a qualified and licensed company, experienced in shopping center tenant improvements in San Diego County, California, ("Engineer") to prepare Engineering Plans based on the Final Preliminary Plans. Tenant's selection of the Engineer shall be subject to the prior written approval of Landlord, which approval will not be unreasonably withheld or delayed. For purposes of the preparation of the Engineering Plans, the Engineer may assume that the Final Preliminary Plans are precise, correct and in compliance with applicable laws and codes. Upon completion of the Engineering Plans, they will be submitted to Landlord and Space Planner for approval. Landlord shall approve, or disapprove for reasonable reasons, the Engineering Plans within five (5) business days after Landlord receives the Engineering Plans and, if disapproved, return the Engineering Plans to Tenant who shall cause the Engineer to make all necessary revisions within five (5) business days after Landlord's receipt thereof. This procedure shall be repeated until Landlord ultimately approves the Engineering Plans. When approved, the Engineering Plans, as modified, shall be deemed the "Final Engineering Plans".

7.  **Construction Documents**. Within ten (10) days following Landlord's approval of the Final Preliminary Plans and the Final Engineering Plans (if any), Tenant shall cause Space Planner to prepare final plans and specifications ("Final Tenant Plans") for completion of the Tenant Improvements. Tenant shall then deliver two (2) complete sets of the Final Tenant Plans to Landlord. Landlord shall approve, or disapprove for reasonable reasons, the Final Tenant Plans within five (5) business days after Landlord receives the Final Tenant Plans and, if disapproved, Landlord shall return the Final Tenant Plans to Tenant who shall cause Space Planner to make all necessary revisions within five (5) days after Tenant's receipt thereof. This procedure shall be repeated until Landlord ultimately approves the Final Tenant Plans. When approved, the Final Tenant Plans, as modified, shall be deemed the "Construction Documents". No construction of the Tenant Improvements shall commence until the Final Tenant Plans have been so approved by Landlord. Any and all costs incurred by Tenant in the preparation of the

EXHIBIT A

Construction Documents shall be deducted from the Tenant Improvement Allowance set forth below in Article 20.

8. **Landlord's Approval of Plans**.  Tenant specifically acknowledges that although Landlord has the right to approve the Space Plan, Final Preliminary Plans, Final Engineering Plans, and Final Tenant Plans, Landlord's sole interest in doing so is to protect the Shopping Center and Landlord's interests.  Accordingly, Tenant shall not rely upon Landlord's approvals and Landlord shall not be the guarantor of, nor responsible for, the correctness or accuracy of any such Space Plan, Final Preliminary Plans, Final Engineering Plans or Final Tenant Plans, or the compliance thereof with applicable laws, and Landlord shall incur no liability of any kind by reason of granting such approvals.

9. **Approvals/Fees/Compliance with Laws**.  Promptly following Landlord's approval of the Construction Documents, Tenant shall apply, at Tenant's sole cost and expense, for all governmental approvals ("Approvals") required for construction of the Tenant Improvements.  Upon receipt of the Approvals, Contractor (defined below) shall commence construction of the Tenant Improvements.  Tenant's failure to commence such construction within thirty (30) days of Tenant's receipt of the Approvals shall constitute a material default under this Agreement and shall entitle Landlord to terminate this Agreement and the Lease.  In addition, Tenant shall, at Tenant's sole cost and expense, be responsible for the payment of (i) all "impact fees" or exactions which may be imposed or assessed as a condition to the issuance of the building permit or other approvals necessary for the construction of the Tenant Improvements; and (ii) all utility hook-up fees and meter setting fees for water, sewer, gas, electric, telephone and any other utility facilities necessary for Tenant's use of the Premises; provided however, Tenant may, upon written notice to Landlord, request that all of the foregoing expenses be deducted from the Tenant Improvement Allowance.  Tenant acknowledges that Tenant shall be solely responsible for investigation of all requirements necessary for obtaining a building permit for the Tenant Improvements, including, without limitation, all requirements for the payment of impact fees and exactions and utility fees and hook-up charges.  Tenant shall undertake all steps necessary to insure that the construction of the Tenant Improvements is accomplished in strict compliance with all state or local laws, ordinances, rules and regulations applicable to such construction and the requirements and standards of any insurance underwriting board, inspection bureau or insurance carrier insuring the Premises pursuant to the Lease.

10. **Construction**.  Tenant shall employ an outside contractor or contractors of Tenant's choice ("Contractor") to construct the Tenant Improvements in substantial conformance with the Construction Documents; provided, however, that the Contractor and construction contracts between Tenant and Contractor and Tenant's subcontractors shall be subject to Landlord's prior written approval (which approval shall not be unreasonably withheld or delayed), and provided further, that the Contractor and the performance of the work shall be subject to the following conditions:

11. **Licensing Requirements/Experience**.  Contractor shall be duly licensed and experienced in the construction of tenant improvements in similar retail premises.

12. **Notice of Commencement**.  Tenant or Contractor shall provide Landlord with at least five (5) days prior written notice of commencement of construction so that Landlord may post appropriate Notices of Non-responsibility within the Premises.

13. **Insurance - OSHA Compliance**.  In addition to the requirements of the Lease, and without any limitation thereof, Contractor and each subcontractor retained by Tenant or by Contractor shall, with respect to the work to be performed by Contractor or each such subcontractor, (a) comply with all governmental rules and regulations, including applicable OSHA standards, and (b) carry Builder's Risk insurance, workers' compensation and public liability insurance (including property damage), with limits and in a form approved in advance by Landlord and issued by insurance companies approved in advance by Landlord.  With the exception of Worker's Compensation insurance, Landlord shall be named as an additional insured on each policy.  Prior to commencement of the Tenant Improvements, Tenant and/or Contractor shall deliver to Landlord certificates evidencing all of the foregoing insurance coverage together with endorsements evidencing that Landlord has been added as an additional insured.

14. **Contractor's Warranty**.  Tenant shall ensure that Contractor and each subcontractor used by Contractor to perform work hereunder, shall guarantee that the portion thereof for which he is responsible, or which he performs, shall be free from any defects in workmanship and materials for a period of not less than one (1) year from the date of completion of the Tenant Improvements.  The correction of such work shall include, without limitation, all expenses and corrections to or in connection with the structure, of which the Tenant Improvements are part, or any common area, should such structure or common area be damaged or affected by such defective work or by the repair or replacement of such defective work.  All such warranties or guarantees as to materials or workmanship with respect to the Tenant Improvements shall be contained in Tenant's agreement with the Contractor, and Tenant shall require Contractor to include such warranties or guarantees in each subcontract, and all such warranties or guarantees shall be so written so that same shall inure to the benefit of both Tenant and Landlord, as their respective interests may appear.  Tenant hereby covenants to give to Landlord any assignment or other assurance necessary to perfect the right to direct enforcement by Landlord.

15. **Material Storage**.  Contractor and each subcontractor retained by Tenant or by Contractor shall obtain prior written approval from Landlord to use any space outside of the Premises and within the Shopping Center to use for storage, handling, or moving of materials or equipment.

EXHIBIT A

16.     **Debris Removal**.  Contractor and each subcontractor retained by Tenant, or by Contractor, shall remove and dispose of, at least once a week or more frequently as Landlord may direct, or as shall be required by OSHA standards or other applicable laws or regulations, all debris and rubbish caused by, or resulting from, or related to, the Tenant Improvements, and upon completion of such Tenant Improvements, shall remove all temporary structures, surplus materials, debris and rubbish remaining within the Shopping Center, which has been brought in or created by or in connection with the same.  If Contractor or any subcontractor shall neglect, refuse, or fail to remove any such debris, rubbish, surplus material or temporary structures within five (5) calendar days after notice to Tenant from Landlord, Landlord may remove or cause same to be removed, and Tenant shall bear the expense of removal and hold Landlord harmless therefor.

17.     **Bond**.  Landlord shall have the right, in Landlord's sole discretion, to require Tenant to furnish a bond or other security, in form satisfactory to Landlord, to assure the prompt, complete and faithful performance of the Tenant Improvements.

18.     **Landlord's Inspection Rights**.  Landlord or Landlord's agents shall have the right to inspect the construction work to be conducted by Tenant during the progress thereof, it being the intent of the parties hereto that Landlord shall be reasonable in its inspection of the construction work conducted by Tenant and that Landlord shall recognize, to the extent commercially reasonable and practicable, the necessity of field changes based on field conditions.  If Landlord shall give notice to Tenant of faulty construction or any other deviation from the Construction Documents, Tenant shall cause Contractor to promptly make corrections.  However, neither the privilege herein granted to Landlord to make such inspections, nor the making of such inspections by Landlord, shall operate as a waiver of any rights of Landlord to require good and workmanlike construction and improvements erected in accordance with the Construction Documents.

19.     **Notice of Completion**.  Tenant shall give Landlord at least five (5) working days prior written notice of the anticipated completion date of the Tenant Improvements.  As a condition precedent to Landlord's approval, Tenant shall be required to settle and/or bond against any mechanic's or materialman's liens, or other similar liens, filed against the Premises and/or the Shopping Center a result of the Tenant Improvements in accordance with the provisions relating to such liens in the Lease.  Tenant shall further reimburse Landlord in full, and indemnify, defend and hold Landlord harmless from and against, any liability, cost or expenses incurred by Landlord in connection with any such liens.  Tenant shall, within ten (10) working days after completion of the Tenant Improvements, execute and record a Notice of Completion with respect thereto, in a form complying with the applicable provisions of the California Civil Code (and in particular specifying the name of Contractor and the kind of work done and/or materials furnished under the construction contract), and shall furnish a copy thereof to the Landlord promptly following recordation in the Official Records of the San Diego County Recorder.

20.     **Tenant Improvement Allowance**.  Landlord will pay an amount equal to Fifty-Eight Thousand Six Hundred Twenty-Five and 00/100 Dollars ($58,625.00) ("Tenant Improvement Allowance") toward the cost of the design, permitting and fees (only to the extent set forth herein) and construction of the Tenant Improvements and for no other purpose. Landlord shall make one (1) payment directly to the Contractor from the Tenant Improvement Allowance, in an amount not to exceed, twenty-five percent (25%) of the Tenant Improvement Allowance, and only after receipt by Landlord of unconditional mechanics' lien releases and receipted bills marked "paid" (which mechanics' lien releases shall, at Landlord's option, be executed by subcontractors, labor suppliers and materialmen, as reasonably determined by Landlord, in addition to the Contractor).  The remaining seventy-five percent (75%) of the Tenant Improvement Allowance shall be paid directly to Tenant within thirty (30) days after the date Tenant opens for business from the Premises, provided Landlord has received the items specified in the preceding sentence. Upon completion of the Tenant Improvements, Tenant shall provide Landlord with a copy of the recorded Notice of Completion as provided in Article 19 above.  In the event the cost of construction of the Tenant Improvements exceeds the available amount of the Tenant Improvement Allowance, Tenant shall pay such excess cost to Landlord within ten (10) business days after Tenant's execution of the construction contract with Contractor, which amount shall be disbursed by Landlord prior to the disbursement of any portion of the Tenant Improvement Allowance.

21.     **Engineering**.  The cost of all electrical, mechanical, and structural engineering, including all permits, licenses, and fees relative to the construction of the Tenant Improvements (including, without limitation, the fees identified in Article 4 above) shall be paid by Tenant, but may be deducted from the Tenant Improvement Allowance.

22.     **Change Orders**.  In the event that Tenant requests (in writing) any changes to the Construction Documents (each being a "Change Order"), Landlord shall not unreasonably withhold its consent to any such Change Order, provided the Change Order does not affect the structure, systems, equipment or appearance of the Premises or the Building.  If such Change Orders, as approved by Landlord, increase the cost of constructing the Tenant Improvements in excess of the Tenant Improvement Allowance, Tenant shall pay such increased costs at the time of Landlord's approval of such Change Order.

23.     **Construction Materials**.  Tenant will utilize, for the construction of the Tenant Improvements, the items and materials specified in the Construction Documents.  However, whenever Tenant determines in its reasonable judgment that it is not practical or efficient to use such materials,

Tenant shall have the right, upon receipt of prior written approval of Landlord, which approval will not be unreasonably withheld or delayed, to substitute comparable items and materials.

24. **Landlord's Fee**. Landlord shall be paid a fee in connection with Landlord's obligations set forth in Article 2 with respect to reviewing and approving the design and construction of the Tenant Improvements for the Premises in the amount of Five Hundred Dollars and no cents ($500.00) which amount shall be deducted from the Tenant Improvement Allowance.

25. **Prompt Construction/General Responsibility for Costs**. Tenant shall instruct Contractor to build the Tenant Improvements as soon as reasonably possible. Since Landlord's sole economic responsibility is to pay the Tenant Improvement Allowance, all of the Tenant Improvements shall be designed and constructed at Tenant's sole and entire cost, with Landlord being obligated only to disburse the Tenant Improvement Allowance pursuant to the terms of this Agreement.

26. **Default**. Any default by Tenant under the terms of this Agreement shall constitute a default under the Lease and shall entitle Landlord to exercise all remedies set forth in the Lease. Tenant shall have any and all rights to remedy such default pursuant to the provisions of the Lease.

27. **Reasonable Diligence**. Both Landlord and Tenant agree to use reasonable diligence in performing all of their respective obligations and duties under this Agreement and in proceeding with the construction and completion of the Tenant Improvements.

28. **Conflicts**. In the event of any conflict between the terms of this Agreement and the Lease, the terms of this Agreement shall control.

LANDLORD

SunBrewer Partners, L.P.,
a California limited partnership

By:     Marusan U.S.A., Inc.,
        a California corporation
        (Sole General Partner)

    By:     _____
            Name: Hiroyasu Nakano
            Title:   President

TENANT

_____
SYDNEY NGUYEN
Social Security No.: _

_____
YUMI BUI
Social Security No.: _

Exhibit B
-4-

EXHIBIT A

Exhibit B-1

## LANDLORD WORK

As soon as reasonably possible after the execution of this Lease, Landlord agrees to do the following:

Except as provided below, Tenant accepts the Premises, land, buildings, improvements, environmental conditions and all other aspects of the Premises in its present condition, "AS-IS", including latent defects, without any representations or warranties, expressed or implied.

Notwithstanding the foregoing, Landlord shall deliver the Premises to Tenant with the HVAC, electrical and plumbing systems in good working order. If, upon Landlord's delivery of the Premises to Tenant, such systems are not in good working order and Tenant notifies Landlord within thirty (30) days of Landlord's delivery of the Premises that such systems are not in good working order, Landlord shall, at Landlord's sole cost and expense and as Tenant's sole remedy therefor, put such systems in good working order.

EXHIBIT A

Exhibit C

SIGN CRITERIA

# GENERAL INFORMATION

This section outlines the acceptable construction methods, materials and standards for the project in order to assure consistent and quality signage.

## A.    Electrical and Illumination

*1.*

All fabrication and installation shall comply with all applicable Underwriter's Laboratories requirements and specific state and local codes. All components shall bare the U.L. label indicating such approval and be manufactured and installed by a U.L. certified shop.

*2.*

All conductors, transformers, ballasts and other such equipment shall be concealed.

*3.*

Primary electric service to all tenant signs shall be placed on the tenant's electric service by licensed contractors. Tenant shall provide time clocks and photo cells for use in conjunction with the illumination hours required by the landlord.

*4.*

Illumination of all sign faces shall be uniform in intensity with no noticeable hot spots or shadows.

*5.*

Illumination and electric specifications must appear on all shop drawings submitted to the landlord for approval and prior to the start of work.

*6.*

All glass housings, electrodes, tube supports, glass tubing, high voltage cables, lamps, ballasts and other electrical components shall be of first quality only.

*7.*

Illumination of all common and tenant signs shall not exceed that as specified in the lighting description for each of the individual signs described in this document.

EXHIBIT A

**B.    Construction**

*1.*

All bolts, fastenings, clips, conduits, etc. shall be hot-dipped galvanized iron or equal. Where externally mounted, all items shall be painted to match the exterior color of the surfaces mounted thereon.

*2.*

All manufacturers and installers are advised that prior to final acceptance, each sign, or sign component, may be inspected for conformance to this document by an authorized representative of the landlord. Any signs or components, before or after installation of same, and found not to be in conformance will be rejected and removed immediately by the tenant, or the tenant's contractor, and replaced in a manner or with materials that are acceptable to the landlord.

*3.*

No substitutes will be accepted by the landlord unless so indicated in the specifications submitted to, and approved by, the landlord.

*4.*

Shop drawings are required prior to the start of any work and shall detail all specifications and methods of constructions outlined by this document.

*5.*

In addition to the requirements listed in this section the tenant and its contractor shall comply with the requirements listed in the Plaza Ranch Peñasquitos-Tenant Sign Criteria.

**C.    Installation/Removals**

*1.*

All penetrations of any building structure that are required for installation of any sign or sign component shall be neatly sealed and continuously maintained in watertight condition.

*2.*

All contractors for installation, removal or service must be fully licensed and provide the landlord with certificates of insurance prior to commencement of work.

EXHIBIT A

*3.*

All methods of attachment to any structure must be detailed on shop drawings and be approved by the landlord and the City of San Diego.

*4.*

Sign removals shall include the patching and repairing of the entire work area plus the repainting of any "ghosted" areas or as directed by the landlord.

**D.   Prohibited Signs**

*1.*

Conformance to the guidelines for signage at Rancho Peñasquitos Plaza will be strictly enforced. Any non-conforming or unapproved signs are strictly forbidden except for those in place prior to 1/1/97.

*2.*

Any flashing, moving, animated, blinking or audible effect signs are prohibited.

*3.*

Any sign on a parked vehicle which has indicated its use for the purpose of advertising a particular tenant, service or product is prohibited.

*4.*

Signs that are movable or transportable and placed in vehicular or pedestrian traffic areas are prohibited.

*5.*

Temporary signs other than those allowed by the City of San Diego are prohibited.

*6.*

Window signs are limited to the provisions found in the "Tenant Signs" section of this document.

**E.   Exceptions/Existing Signs**

*1.*

Any variations or changes from the signs allowed by this must be submitted to the landlord and the City of San Diego for review.

EXHIBIT A

*2.*

All applications for exceptions must be accompanied by color renderings, samples and shop drawings for consideration.

3.

All existing tenant signs will be permitted so long as they are not substantially modified. New tenants will be required to conform to all standards as set forth in this criteria.

**F.    Designs/Submittals**

*1.*

It is expected that professional designers will prepare the art work for all tenants and that such art work will include scaled schematic drawings, specifications and color renderings.

*2.*

The tenant shall submit, or cause to be submitted, three(3) sets of submittals for any planned or proposed sign.

Exhibit C
-4-

EXHIBIT A

# TENANT SIGNAGE

This section describes in general terms each of the tenant sign types. For graphic representations and details see "Exhibits" section of this document.

## A.    Major Tenants/All

*1.    Purpose:* To identify major tenants with greater than 7,000 sq. ft. of useful leased space to the traffic on the adjoining freeway and to the visitors to the project.

*2.    Sign Type:* Internally illuminated channel letters with acrylic faces.

*3.    Size:* The sign area will be appropriate to the scale of the building and confined to the area shown for each major tenant in the "Exhibits" section of this document.

*4.    Locations:* As per exhibits.

*5.    Number:* Each major tenant will be allowed signs on the front and rear elevations as per exhibits.

*6.    Type style/Logos:* The use of corporate logos, trade styles and colors shall be permitted provided that approval is obtained from the landlord and the City of San Diego prior to production and/or installation of signage.

*7.    History:* At the time of this writing the major tenants are as follows;

|  |  |  |
|---|---|---|
| a.) | Major One: | Lucky Stores |
| b.) | Major Two: | Children's World |
| c.) | Major Three: | Thrifty |
| d.) | Major Four: | Elite Fitness Center |

## B.    Shop Tenants/All

*1.    Purpose:* To identify shop tenants to the visitors of the project.

*2.    Sign Type:* Indirectly illuminated, single-sided sandblasted redwood signs.

*3.    Size:* The sign area will be 30" x 9' for single spaces and 30" x 14' for two or more combined spaces.

EXHIBIT A

4.    *Locations:* As per exhibits.

5.    *Number:* Each shop tenant will be allowed one sign located at the center of their lease frontage except for corner or end tenants who shall be allowed one additional sign on their side or end fascia.

6.    *Type style/Logos:* The use of corporate logos, trade styles and colors shall be permitted provided that approval is obtained from the landlord and the City of San Diego prior to production and/or installation of signage.

7.    *History:* At the time of this writing the shop tenants are all in compliance with the sign criteria put forth by this document.

## C.    Pad Tenants/All

1.    *Purpose:* To identify pad tenants to visitors of the project.

2.    *Sign Type:* Internally illuminated channel letters with acrylic faces.

3.    *Size:* The sign area will be appropriate to the scale of the building and confined to the area shown for each pad tenant in the "Exhibits" section of this document.

4.    *Locations:* As per exhibits.

5.    *Number:* Each pad tenant will be allowed signs as per the "Exhibits" section of this document.

6.    *Type style/Logos:* The use of corporate logos, trade styles and colors shall be permitted provided that approval is obtained from the landlord and the City of San Diego prior to production and/or installation of signage.

7.    *History:* At the time of this writing the pad tenants are as follows;

a.) Pad One:      Mr. Sudz
b.) Pad Two:      Hollywood Video
c.) Pad Three:    (vacant)

EXHIBIT A

**D.    Incidental/All Tenants**

1.

Tenants may, at their sole expense and cost, place and maintain within the window areas of their shop signs and/or graphics intended to assist shoppers in an informative and interesting manner. However, cluttered displays will not be allowed.

2.

Window displays shall be limited to 10% of tenant's aggregate window area. Neon window displays must comply with U.L. standards and bare a U.L. label. Window displays must comply with all applicable local, state and federal requirements.

3.

Customer entry door signs will be limited to the name and/or logo of the tenant only and up to Three(3) lines of 2" copy limited to business hours, address or product and services listing. The total area of door signs or graphics in all cases shall be limited to two(2) square feet overall. Up to three(3) credit card decals can be displayed in addition.

4.

Rear door or delivery entrances shall display the tenant address numerals and tenant name only and shall be Helvetica Medium, 3" high letters and/or numerals and manufactured using 3M Scotchcal, opaque black. Copy to be horizontally centered on door, 5'-6" from grade.

EXHIBIT A

## E.    Tenant Type/Location Schedule

The tenants are listed below with their classification and address. This listing corresponds with the information presented on the plot plan located in the "Exhibits" section of this document. All addresses are for Carmel Mountain Road.

| Tenant Designation | Address |
|---|---|
| Major One | 9909 |
| Major Two | 9995 |
| Major Three | 10021 |
| Major Four | 10025 |
| | |
| Pad One | 9821 |
| Pad Two | 9855 |
| Pad Three | 9939 |

### Shop Tenants/ All Addresses

| | | |
|---|---|---|
| 9867 | 9995-B2 | 9955-F1 |
| 9871 | 9995-B3 | 9955-F2 |
| 9873 | 9995-B4 | 9955-F3 |
| 9875 | 9995-B5 | 9955-F4 |
| 9881 | 9995-B6 | |
| 9879 | 9995-B7 | 9951-E1 |
| 9877 | 9995-B9 | 9951-E2 |
| 9883 | 9995-B10 | 9951-E3 |
| 9885 | 9995-B11 | |
| 9887 | 9995-B12 | 9945-D1 |
| 9889 | | 9945-D2 |
| 9917 | 9975-G1 | 9945-D3 |
| 9919 | 9975-G2 | 9945-D4 |
| 9921 | 9975-G3 | |
| 9923 | 9975-G4 | |
| 9925 | 9975-G5 | |
| 9927 | 9975-G6 | |
| 9929 | 9975-G7 | |

EXHIBIT A



Exhibit C
-9-

EXHIBIT A



Exhibit C
-10-

EXHIBIT A



Exhibit C
-11-

EXHIBIT A





Exhibit C
-13-

EXHIBIT A

Exhibit D

RULES & REGULATIONS

This Exhibit "D" (Rules and Regulations) sets forth the rules and regulations governing Tenant's use of the Premises pursuant to the terms, covenants and conditions of the Lease to which this Exhibit "D" (Rules and Regulations) is attached and therein made a part thereof.  In the event of any conflict between this Exhibit "D" (Rules and Regulations) and the Lease, the Lease shall control.

1.      All loading and unloading shall be done only at such times, in the areas, and through entrances designated by Landlord.

2.      The delivery or shipping of merchandise, supplies and fixtures to and from the Leased Property shall be subject to such rules and regulations as, in the judgment of Landlord, are necessary for the proper operation of the Premises or the Shopping Center.

3.      No aerial shall be erected on the roof or exterior walls of the Premises or in the Shopping Center without in each instance the written consent of Landlord.  Any aerial so installed without such written consent shall be subject to removal without notice, at any time, at Tenant's expense.

4.      Tenant shall not, without the written consent of Landlord first had and obtained, use in or about the Premises any advertising or promotional media such as searchlights, loud speakers, phonographs or other similar visual or audio media which can be seen or heard outside the Premises.

5.      The exterior areas immediately adjoining the Premises shall be kept clean and free from dirt and rubbish by Tenant to the satisfaction of Landlord, and Tenant shall not place or permit any obstructions or merchandise in such areas.

6.      Tenant and Tenant's employees shall park their cars only in those parking areas designated for that purpose by Landlord.  Tenant shall furnish Landlord with State automobile license numbers assigned to Tenant's car or cars, and cars of Tenant's employees, within five (5) days after taking possession of the Premises and shall thereafter notify Landlord of any changes within five (5) days after such changes occur.  In the event that Tenant or its employees fail to park their cars in designated parking areas as aforesaid, then Landlord, at its option, in addition to any other remedies, including but not limited to, towing, may charge Tenant the sum of ten dollars ($10.00) per day per car parked in any area other than those designated.

7.      The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose employees, agents, servants, customers or invitees shall have caused it.

8.      Tenant shall keep the Premises free from pests or vermin.

9.      Tenant shall not burn any trash or garbage of any kind in or about the Premises or the Shopping Center.

10.     Tenant shall not make noises, cause disturbances, or create odors, which may be offensive to Landlord or to other tenants of the Shopping Center or their employees, agents, servants, customers or invitees.

11.     No portion of the Premises or the Shopping Center shall be used for sale or display of any obscene, pornographic, so-called "adult" or other offensive merchandise or activities.

12.     Without Landlord's written consent therefor first had and contained, no sign or other object or thing visible to public view outside of the Premises shall be placed or allowed on the exterior of the Premises or in the interior of the Premises in such a manner as shall be visible from outside the Premises, except that Tenant shall, at its expense, erect a sign on the exterior of the Premises of such size, shape, materials and design as may be prescribed by Landlord.  Tenant shall be made to properly maintain its sign, including prompt repairs of any nature. Upon expiration of the Lease, Tenant shall be responsible for promptly removing all signs placed in or around the Premises by Tenant.  Tenant shall repair all damage caused to the building or Leased Property by such removal, including "capping  of electrical wiring.

13.     Tenant and Tenant's employees and agents shall not solicit business in the parking areas or other Common Area, nor shall Tenant distribute any handbills or other advertising matter in automobiles parked in the parking area or other Common Area.

14.     Tenant shall refrain from keeping, displaying or selling any merchandise or any object outside of the interior of the Premises or in any portion of any sidewalks, walkways or other part of the Shopping Center outside of the Premises.

EXHIBIT A

Exhibit E

## CONFIRMATION OF LEASE TERMS

This Confirmation of Lease Terms is made as of _____, between *SunBrewer Partners, L.P., a California limited partnership* ("Landlord"), and *Sydney Nguyen and Yumi Bui, husband and wife dba Saigon Noodles* ("Tenant"), who agree as follows:

     1.    Landlord and Tenant entered into a lease, dated _____, in which Landlord leased to Tenant and Tenant leased from Landlord the premises commonly known as _____ Carmel Mountain Road, San Diego, CA 92129 ("Premises").

     2.    Landlord and Tenant agree to confirm the commencement and expiration dates of the Term, the commencement date of Rent, and the first rental adjustment date, as follows:

     a.    The Commencement Date of the Term of the Lease is _____.

     b.    The Expiration Date of the Term of the Lease is _____.

     c.    The Commencement Date of Rent and Additional Rent under the Lease is _____; and

     d.    The first Minimum Rent Adjustment Date under the Lease shall be _____.

     3.    Tenant confirms that:

     a.    It has accepted possession of the Premises as provided in the Lease;

     b.    The improvements and space required to be furnished by Landlord under the Lease have been furnished;

     c.    Landlord has fulfilled all its duties of an inducement nature;

     d.    The Lease has not been modified, altered, or amended;

     e.    There are no setoffs or credits against rent, and no security deposit has been paid except as provided by the Lease;

     f.    Tenant has no notice of a prior assignment, hypothecation, or pledge of rent, or of the Lease; and

     g.    All terms and conditions of the Lease are in full force and effect.

Exhibit E
-1-

EXHIBIT A

4.     The provisions of this confirmation of term of Lease shall inure to the benefit, or bind, as the case may require, the parties and their respective successors subject to the restrictions on assignment and subleasing contained in the Lease.

LANDLORD                                                    TENANT

SunBrewer Partners, L.P.,
a California limited partnership                            _____
                                                           SYDNEY NGUYEN
                                                           Social Security No.: _____
By:     Marusan U.S.A., Inc.,
        a California corporation
        (Sole General Partner)

                                                           _____
        By:     _____           YUMI BUI
                Name: Hiroyasu Nakano                       Social Security No.: _____
                Title:   President

EXHIBIT A

# EXHIBIT B

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE ("**Amendment**") is made and entered into as of the _28th_ day of August, 2018 by and between SUNBREWER PARTNERS, L.P., a California limited partnership ("**Landlord**"), and SYDNEY NGUYEN AND YUMI BUI, husband and wife ("**Tenant**").

## R E C I T A L S :

A.     Landlord and Tenant entered into that certain Standard Commercial Retail Lease dated as of April 1, 2011 (the "**Lease**"), whereby Tenant leased certain retail space in the shopping center known as Plaza Rancho Penasquitos in San Diego, California.

B.     By this Amendment, Landlord and Tenant desire to extend the Term of the Lease and to otherwise modify the Lease as provided herein.

C.     Unless otherwise defined herein, capitalized terms as used herein shall have the same meanings as given thereto in the Lease.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## A G R E E M E N T :

1.     The Premises.  Landlord currently leases to Tenant the Premises, which the parties agree contain 1,675 square feet located at 9975 Carmel Mountain Road, Suite G-1, San Diego, California.

2.     Extended Lease Term.  The Term of the Lease shall be extended such that the Lease shall terminate on January 31, 2024 ("**New Termination Date**").  The period from February 1, 2019 through the New Termination Date is referred to herein as the "**Extension Term**."  Except as provided in Section 6 below, Tenant shall not have any right to extend the Lease beyond the Extension Term; consequently, Section 1 of the Addendum to Lease attached to the Lease shall be null and void.

3.     Monthly Minimum Rent.  During the Extension Term, Tenant shall pay monthly Minimum Rent for the Premises as follows:

| Period of Extended Term | Monthly Minimum Rent | Annual Minimum Rent |
|---|---|---|
| 2/1/19 – 1/31/20* | $5,309.75 | $63,717.00 |
| 2/1/20 – 1/31/21 | $5,469.04 | $65,628.48 |



- 1 -

EXHIBIT B

| | | |
|---|---|---|
| 2/1/21 – 1/31/22 | $5,633.11 | $67,597.32 |
| 2/1/22 – 1/31/23 | $5,802.11 | $69,625.32 |
| 2/1/23 – 1/31/24 | $5,976.17 | $71,714.04 |

\* Subject to abatement as set forth in Section 4 below.

4.     <u>Minimum Rent Abatement</u>.  Notwithstanding anything to the contrary contained in Section 3 above, and provided that Tenant faithfully performs all of the terms and conditions of the Lease, Landlord hereby agrees to abate Tenant's obligation to pay monthly Minimum Rent for the months of February, 2019 and March, 2019.  During such abatement periods, Tenant shall still be responsible for the payment of all of its other monetary obligations under the Lease.  In the event of a default by Tenant under the terms of the Lease that results in early termination pursuant to the provisions of Section 22.1 of the Original Lease, then as a part of the recovery set forth in Section 22.2 of the Original Lease, Landlord shall be entitled to the recovery of the monthly Minimum Rent that was abated under the provisions of this Section 4.

5.     <u>Improvements to the Premises</u>.  Promptly after full execution and delivery of this Amendment, and at a mutually convenient time to be agreed upon by Landlord and Tenant, Landlord shall, at Landlord's sole cost and expense, repair and or replace (as needed, as reasonably determined by Landlord) the HVAC units serving the Premises to put such units in good working order.   Tenant hereby acknowledges that Landlord will be performing such improvement work during the Extension Term, Landlord's performance of such work shall not be deemed a constructive eviction of Tenant and Tenant shall not be entitled to any abatement of Rent (except as provided in Section 4 above), nor shall Landlord be liable for any injury or damage to person, property or business in connection therewith.  Except as specifically set forth in this Section 5, Tenant acknowledges that Landlord shall not be obligated to provide or pay for any improvement work or services related to the improvement of the Premises.  Tenant also acknowledges that Landlord has made no representation or warranty regarding the condition of the Premises.

6.     <u>Option to Extend</u>.  Provided Tenant is not then in default with respect to the Lease and has kept and performed all of its obligations under the Lease, Tenant shall have the right and option ("**Option**") at any time, no later than six (6) months but no earlier than nine (9) months before the expiration of the Extension Term, to extend the Extension Term for one (1) additional period of five (5) years from the date of expiration of the Extension Term (the "**Extended Term**"), which notice of exercise of option shall only be effective if in writing and sent to the Landlord as provided in the Lease for the mailing of notices.  Provided, however, that Tenant may not exercise this right if (i) Tenant has received three (3) or more notices of default throughout the Extension Term, whether or not those defaults were cured, (ii) at any time when Tenant has breached and not cured or is in default under the Lease, or (iii) at no time during the Extension Term shall Tenant have been delinquent in the payment of any amount due under the Lease for more than ten (10) days in two (2) separate instances.  Should Tenant breach or default under the Lease at any time after giving notice of extension and prior to the first day of the Extended Term, Landlord shall have the right to declare Tenant's notice void and of no effect, and the Extended Term shall expire as if notice had not been given.

*HN*

- 2 -

In the event that Tenant timely exercises its Option as to the Extended Term, then the Extension Term shall be extended through the end of the Extended Term (subject to earlier termination pursuant to the provisions of the Lease) and the Lease shall continue in full force and effect without modification, except that the Minimum Rent payable for the first year of the Extended Term shall be adjusted to an amount equal to the greater of (i) the fair rental value for the Premises as determined pursuant to the following paragraph, or (ii) the amount determined by increasing the Minimum Rent in effect immediately prior to the commencement of the Extended Term by three percent (3%). Notwithstanding anything contained in this paragraph, in no event shall the Minimum Rent for the Extended Term be less than item (ii) in the preceding sentence. After the Minimum Rent for the first year of the Extended Term has been established, them, on each anniversary of the commencement of the Extended Term, Minimum Rent shall thereafter be increased to one hundred three percent (103%) of the Minimum Rent payable immediately prior to the anniversary in question.

If the parties are unable to agree on the Minimum Rent for the Extended Term within sixty (60) days following Tenant's notice of its exercise of its Option with respect to the Extended Term, then the Minimum Rent for the first year of the Extended Term shall be determined by arbitration as follows: Within fifteen (15) days after the expiration of such 60 day period, each party shall appoint as an arbitrator a duly qualified real estate broker with a reputable brokerage firm who has at least five (5) years experience in leasing and selling retail properties. Within fifteen (15) days after their appointment, the two arbitrators so appointed shall appoint a third person similarly qualified to act as the third arbitrator. If the two arbitrators appointed by the parties are unable to agree on the third arbitrator, then the parties (or either of them) shall diligently apply to the Presiding Judge of Superior Court in the State of California, County of San Diego, for the appointment of such person. Within thirty (30) days after appointment of the third arbitrator, the three arbitrators shall determine the fair market rental for the space taking into account the terms of the Lease, the location of the Shopping Center and its major co tenants, and the market rental value of similar space within the Shopping Center, and the amount so determined shall be used as the basis for a computation by them of the Minimum Rent hereunder. In the event the arbitrators are unable to reach a unanimous agreement, the vote of two shall control and the decision of the arbitrators shall be final and binding upon the parties hereto. Landlord and Tenant shall each bear one-half of the cost of any such arbitration.

In the event the Minimum Rent for the first year of the Extended Term has not been finally determined as of the commencement of the Extended Term, Tenant shall continue to pay the Minimum Rent payable during the last year of the Extension Term and within 30 days following determination of the new Minimum Rent, Tenant shall pay to Landlord the amount necessary to make up any deficiency between the amount theretofore paid by Tenant as Minimum Rent for the Extended Term and the actual Minimum Rent payable for such period. Any Security Deposit held by Landlord shall be increased in the ratio as the Minimum Rent is increased in the first year of the Extended Term divided by the Minimum Rent for the first year of the Extension Term. Upon default in payment of the full increase in rental provided for above, Landlord shall have the same rights and remedies as upon default in the rent otherwise provided for in the Lease.



EXHIBIT B

This Option may be exercised only by the original Tenant named in this Amendment while physically occupying the Premises and any consent by Landlord to assignment or sublease of the Premises shall not be construed as a waiver of this prohibition.

7.      Landlord's Address.    Effective as of the date hereof, Landlord's address for notices under the Lease shall be:

> c/o 1st Commercial Management Group – San Diego, Inc.
> 9875 Carmel Mountain Road
> San Diego, CA 92129
> Attn: Roberta Lawler
> Telephone: (858) 538-7500
> Fax: (858) 538-7501

8.      Brokers.    Each party represents and warrants to the other that no broker, agent or finder, other than 1st Commercial Management Group – San Diego, Inc. (the "**Broker**"), negotiated or was instrumental in negotiating or consummating this Amendment. Each party further agrees to defend, indemnify and hold harmless the other party from and against any claim for commission or finder's fee by any person or entity, other than Broker, who claims or alleges that they were retained or engaged by the indemnifying party or at the request of such party in connection with this Amendment.

9.      Confidentiality.    Tenant acknowledges that the terms of this Amendment have been negotiated between Landlord and Tenant based upon particular and unique circumstances, and that it is of the utmost importance to Landlord that the terms of this Amendment not be disclosed to any third parties, including without limitation, other tenants or occupants of the Shopping Center.    Therefore Tenant, on behalf of itself and its employees, agents and contractors, agrees not to disclose the terms of this Amendment to any third parties, including without limitation, other tenants or occupants of the Shopping Center.    In the event that Tenant breaches the provisions of this Section 9, then Landlord shall be entitled to recover any and all damages incurred by Landlord as a result of Tenant's breach and pursue any and all other rights and remedies against Tenant for such breach as provided under the Lease and as otherwise provided by law or in equity.

10.     Accessibility Disclosure.    As of the date of this Amendment, the Premises has not been inspected by a Certified Access Specialist ("**CASp**").    Landlord hereby makes the following disclosure pursuant to California Civil Code Section 1938: "A CASp can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law.    Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises."    Landlord and Tenant hereby mutually agree that, if Tenant requests or otherwise obtains a CASp inspection of the Premises or any other area(s) within the Shopping Center



- 4 -

(which Tenant must request or otherwise obtain, if at all, within thirty (30) days of the date of this Amendment), then (a) Tenant shall utilize a CASp designated by Landlord; (b) Tenant's contract with the CASp shall require that the CASp's inspection report be addressed to both Landlord and Tenant and expressly state that Landlord is a third-party beneficiary of such contract; (c) Tenant shall pay the cost of such inspection, (d) such inspection shall occur at a time mutually agreed upon by Landlord and Tenant and shall be conducted in a professional manner that does not in any way damage the Premises or Shopping Center, (e) Tenant shall provide Landlord with a copy of the CASp's report resulting from such inspection within ten (10) days of Tenant's receipt thereof, (f) Tenant shall keep the CASp's inspection and all information in the CASp's report confidential except as necessary to perform the necessary repairs or to comply with any disclosures required by law, and (g) Tenant shall, at its sole cost and expense, make all repairs necessary to correct violations of construction related accessibility standards identified by such inspection, which repairs shall be completed in accordance with the provisions of Article 10 of the Lease and no later than one hundred twenty (120) days following the date of such CASp inspection; however, if any such repairs affect the structure of the Premises, the Shopping Center's systems and equipment or the Common Areas, then such repairs will be made by Landlord and Tenant shall reimburse Landlord for the entire cost thereof within thirty (30) days following receipt of an invoice therefor.

11.    Defaults.  Tenant hereby represents and warrants to Landlord that, as of the date of this Amendment, Tenant is in full compliance with all terms, covenants and conditions of the Lease and that there are no breaches or defaults under the Lease by Landlord or Tenant, and that Tenant knows of no events or circumstances which, given the passage of time, would constitute a default under the Lease by either Landlord or Tenant.

12.    No Further Modification.  Except as set forth in this Amendment, all of the terms and provisions of the Lease shall apply during the Extension Term and shall remain unmodified and in full force and effect.  Effective as of the date hereof, all references to the "Lease" shall refer to the Lease as amended by this Amendment.

13.    Counterparts and Fax/Email Signatures.  This Amendment may be executed in counterparts, each of which shall be deemed an original, but such counterparts, when taken together, shall constitute one agreement.  This Amendment may be executed by a party's signature transmitted by facsimile ("**fax**") or email, and copies of this Amendment executed and delivered by means of faxed or emailed copies of signatures shall have the same force and effect as copies hereof executed and delivered with original wet signatures.  All parties hereto may rely upon faxed or emailed signatures as if such signatures were original wet signatures.  Any party executing and delivering this Amendment by fax or email shall promptly thereafter deliver a counterpart signature page of this Amendment containing said party's original signature.  All parties hereto agree that a faxed or emailed signature page may be introduced into evidence in any proceeding arising out of or related to this Amendment as if it were an original wet signature page.

[SIGNATURE PAGE FOLLOWS]

*HN*

EXHIBIT B

IN WITNESS WHEREOF, this Amendment has been executed as of the day and year first above written.

"Landlord:"

SUNBREWER PARTNERS, L.P.,
a California limited partnership

By:    Marusan U.S.A., Inc.,
       a California corporation
       (Sole General Partner)

       By:  _____

          Name: Hiroyasu Nakano
          Title:  President

"Tenant":

_____

SYDNEY NGUYEN
Social Security No.:

_____

YUMI BUI
Social Security No.:__

EXHIBIT B

# EXHIBIT C

| Database: | WCRETAIL | Tenant Ledger Summary Report | | | Page: | 1 |
|---|---|---|---|---|---|---|
| | | | | | Date: | 5/14/2021 |
| Current Tenant | | Saigon Noodles | | | Time: | 7:10 PM |
| | | Transactions From  01/20 through  05/21 | | | | |

| Period Category | Description | Beginning Balance | Charges | Cash Received | Adjustments | Ending Balance |
|---|---|---|---|---|---|---|
| **01/20** | | | | | | |
| CAM | Common Area Maintenance | 0.00 | 1,150.00 | -1,150.00 | 0.00 | 0.00 |
| INS | Insurance | 0.00 | 46.00 | -46.00 | 0.00 | 0.00 |
| MFR | Marketing Fund Reimb | 0.00 | 38.00 | -38.00 | 0.00 | 0.00 |
| RET | Real Estate Taxes | 0.00 | 284.00 | -284.00 | 0.00 | 0.00 |
| RNT | Base Rent | 0.00 | 5,309.75 | -5,309.75 | 0.00 | 0.00 |
| | **Total** | **0.00** | **6,827.75** | **-6,827.75** | **0.00** | **0.00** |
| **02/20** | | | | | | |
| CAM | Common Area Maintenance | 0.00 | 1,150.00 | -1,150.00 | 0.00 | 0.00 |
| INS | Insurance | 0.00 | 46.00 | -46.00 | 0.00 | 0.00 |
| MFR | Marketing Fund Reimb | 0.00 | 38.00 | -38.00 | 0.00 | 0.00 |
| RET | Real Estate Taxes | 0.00 | 284.00 | -284.00 | 0.00 | 0.00 |
| RNT | Base Rent | 0.00 | 5,469.04 | -5,309.75 | 0.00 | 159.29 |
| | **Total** | **0.00** | **6,987.04** | **-6,827.75** | **0.00** | **159.29** |
| **03/20** | | | | | | |
| CAM | Common Area Maintenance | 0.00 | 1,150.00 | -1,150.00 | 0.00 | 0.00 |
| INS | Insurance | 0.00 | 46.00 | -46.00 | 0.00 | 0.00 |
| MFR | Marketing Fund Reimb | 0.00 | 38.00 | -38.00 | 0.00 | 0.00 |
| RET | Real Estate Taxes | 0.00 | 284.00 | -284.00 | 0.00 | 0.00 |
| RNT | Base Rent | 159.29 | 5,469.04 | -5,309.75 | 0.00 | 318.58 |
| | **Total** | **159.29** | **6,987.04** | **-6,827.75** | **0.00** | **318.58** |
| **04/20** | | | | | | |
| CAM | Common Area Maintenance | 0.00 | 1,150.00 | 0.00 | 0.00 | 1,150.00 |
| INS | Insurance | 0.00 | 46.00 | 0.00 | 0.00 | 46.00 |
| MFR | Marketing Fund Reimb | 0.00 | 38.00 | 0.00 | 0.00 | 38.00 |
| RET | Real Estate Taxes | 0.00 | 284.00 | 0.00 | 0.00 | 284.00 |
| RNT | Base Rent | 318.58 | 5,469.04 | 0.00 | 0.00 | 5,787.62 |
| | **Total** | **318.58** | **6,987.04** | **0.00** | **0.00** | **7,305.62** |
| **05/20** | | | | | | |
| CAM | Common Area Maintenance | 1,150.00 | 1,150.00 | 0.00 | 0.00 | 2,300.00 |
| CAY | CAM-Prior Year | 0.00 | 0.00 | 0.00 | -878.21 | -878.21 |
| INS | Insurance | 46.00 | 46.00 | 0.00 | 0.00 | 92.00 |
| INY | Insurance-Prior Year | 0.00 | 18.91 | 0.00 | 0.00 | 18.91 |
| MFR | Marketing Fund Reimb | 38.00 | 38.00 | 0.00 | 0.00 | 76.00 |
| RET | Real Estate Taxes | 284.00 | 284.00 | 0.00 | 0.00 | 568.00 |
| REY | R/E Tax-Prior Year | 0.00 | 18.20 | 0.00 | 0.00 | 18.20 |
| RNT | Base Rent | 5,787.62 | 5,469.04 | 0.00 | 0.00 | 11,256.66 |
| | **Total** | **7,305.62** | **7,024.15** | **0.00** | **-878.21** | **13,451.56** |
| **06/20** | | | | | | |
| CAM | Common Area Maintenance | 2,300.00 | 1,150.00 | 0.00 | 0.00 | 3,450.00 |
| CAY | CAM-Prior Year | -878.21 | 0.00 | 0.00 | 0.00 | -878.21 |
| INS | Insurance | 92.00 | 46.00 | 0.00 | 0.00 | 138.00 |
| INY | Insurance-Prior Year | 18.91 | 0.00 | 0.00 | 0.00 | 18.91 |
| MFR | Marketing Fund Reimb | 76.00 | 38.00 | 0.00 | 0.00 | 114.00 |
| RET | Real Estate Taxes | 568.00 | 284.00 | 0.00 | 0.00 | 852.00 |
| REY | R/E Tax-Prior Year | 18.20 | 0.00 | 0.00 | 0.00 | 18.20 |
| RNT | Base Rent | 11,256.66 | 5,469.04 | 0.00 | 0.00 | 16,725.70 |
| | **Total** | **13,451.56** | **6,987.04** | **0.00** | **0.00** | **20,438.60** |
| **07/20** | | | | | | |
| CAM | Common Area Maintenance | 3,450.00 | 1,150.00 | 0.00 | 0.00 | 4,600.00 |
| CAY | CAM-Prior Year | -878.21 | 0.00 | 0.00 | 0.00 | -878.21 |
| INS | Insurance | 138.00 | 46.00 | 0.00 | 0.00 | 184.00 |
| INY | Insurance-Prior Year | 18.91 | 0.00 | 0.00 | 0.00 | 18.91 |
| MFR | Marketing Fund Reimb | 114.00 | 38.00 | 0.00 | 0.00 | 152.00 |
| RET | Real Estate Taxes | 852.00 | 284.00 | 0.00 | 0.00 | 1,136.00 |
| REY | R/E Tax-Prior Year | 18.20 | 0.00 | 0.00 | 0.00 | 18.20 |
| RNT | Base Rent | 16,725.70 | 5,469.04 | 0.00 | 0.00 | 22,194.74 |
| | **Total** | **20,438.60** | **6,987.04** | **0.00** | **0.00** | **27,425.64** |

EXHIBIT C

| Database: | WCRETAIL | Tenant Ledger Summary Report | | | | Page: | 2 |

| Current Tenant | | Saigon Noodles | | | | Date: | 5/14/2021 |
| | | Transactions From 01/20 through 05/21 | | | | Time: | 7:10 PM |

| Period Category | Description | Beginning Balance | Charges | Cash Received | Adjustments | Ending Balance |
|---|---|---|---|---|---|---|
| **08/20** | | | | | | |
| CAM | Common Area Maintenance | 4,600.00 | 1,150.00 | 0.00 | 0.00 | 5,750.00 |
| CAY | CAM-Prior Year | -878.21 | 0.00 | 0.00 | 0.00 | -878.21 |
| INS | Insurance | 184.00 | 46.00 | 0.00 | 0.00 | 230.00 |
| INY | Insurance-Prior Year | 18.91 | 0.00 | 0.00 | 0.00 | 18.91 |
| MFR | Marketing Fund Reimb | 152.00 | 38.00 | 0.00 | 0.00 | 190.00 |
| RET | Real Estate Taxes | 1,136.00 | 284.00 | 0.00 | 0.00 | 1,420.00 |
| REY | R/E Tax-Prior Year | 18.20 | 0.00 | 0.00 | 0.00 | 18.20 |
| RNT | Base Rent | 22,194.74 | 5,469.04 | 0.00 | 0.00 | 27,663.78 |
| | **Total** | **27,425.64** | **6,987.04** | **0.00** | **0.00** | **34,412.68** |
| **09/20** | | | | | | |
| CAM | Common Area Maintenance | 5,750.00 | 1,150.00 | 0.00 | 0.00 | 6,900.00 |
| CAY | CAM-Prior Year | -878.21 | 0.00 | 0.00 | 0.00 | -878.21 |
| INS | Insurance | 230.00 | 46.00 | 0.00 | 0.00 | 276.00 |
| INY | Insurance-Prior Year | 18.91 | 0.00 | 0.00 | 0.00 | 18.91 |
| MFR | Marketing Fund Reimb | 190.00 | 38.00 | 0.00 | 0.00 | 228.00 |
| RET | Real Estate Taxes | 1,420.00 | 284.00 | 0.00 | 0.00 | 1,704.00 |
| REY | R/E Tax-Prior Year | 18.20 | 0.00 | 0.00 | 0.00 | 18.20 |
| RNT | Base Rent | 27,663.78 | 5,469.04 | 0.00 | 0.00 | 33,132.82 |
| | **Total** | **34,412.68** | **6,987.04** | **0.00** | **0.00** | **41,399.72** |
| **10/20** | | | | | | |
| CAM | Common Area Maintenance | 6,900.00 | 1,150.00 | -5,528.00 | 0.00 | 2,522.00 |
| CAY | CAM-Prior Year | -878.21 | 0.00 | 0.00 | 0.00 | -878.21 |
| INS | Insurance | 276.00 | 46.00 | -184.00 | 0.00 | 138.00 |
| INY | Insurance-Prior Year | 18.91 | 0.00 | 0.00 | 0.00 | 18.91 |
| MFR | Marketing Fund Reimb | 228.00 | 38.00 | -152.00 | 0.00 | 114.00 |
| RET | Real Estate Taxes | 1,704.00 | 284.00 | -1,136.00 | 0.00 | 852.00 |
| REY | R/E Tax-Prior Year | 18.20 | 0.00 | 0.00 | 0.00 | 18.20 |
| RNT | Base Rent | 33,132.82 | 5,469.04 | 0.00 | 0.00 | 38,601.86 |
| | **Total** | **41,399.72** | **6,987.04** | **-7,000.00** | **0.00** | **41,386.76** |
| **11/20** | | | | | | |
| CAM | Common Area Maintenance | 2,522.00 | 1,150.00 | -3,672.00 | 0.00 | 0.00 |
| CAY | CAM-Prior Year | -878.21 | 878.21 | 0.00 | 0.00 | 0.00 |
| INS | Insurance | 138.00 | 46.00 | -184.00 | 0.00 | 0.00 |
| INY | Insurance-Prior Year | 18.91 | 0.00 | -18.91 | 0.00 | 0.00 |
| MFR | Marketing Fund Reimb | 114.00 | 38.00 | -152.00 | 0.00 | 0.00 |
| RET | Real Estate Taxes | 852.00 | 284.00 | -1,136.00 | 0.00 | 0.00 |
| REY | R/E Tax-Prior Year | 18.20 | 0.00 | -18.20 | 0.00 | 0.00 |
| RNT | Base Rent | 38,601.86 | 5,469.04 | -2,524.85 | 0.00 | 41,546.05 |
| | **Total** | **41,386.76** | **7,865.25** | **-7,705.96** | **0.00** | **41,546.05** |
| **12/20** | | | | | | |
| CAM | Common Area Maintenance | 0.00 | 1,150.00 | 0.00 | 0.00 | 1,150.00 |
| INS | Insurance | 0.00 | 46.00 | 0.00 | 0.00 | 46.00 |
| MFR | Marketing Fund Reimb | 0.00 | 38.00 | 0.00 | 0.00 | 38.00 |
| RET | Real Estate Taxes | 0.00 | 284.00 | 0.00 | 0.00 | 284.00 |
| RNT | Base Rent | 41,546.05 | 5,469.04 | 0.00 | 0.00 | 47,015.09 |
| | **Total** | **41,546.05** | **6,987.04** | **0.00** | **0.00** | **48,533.09** |
| **01/21** | | | | | | |
| CAM | Common Area Maintenance | 1,150.00 | 1,139.00 | -2,289.00 | 0.00 | 0.00 |
| INS | Insurance | 46.00 | 47.00 | -93.00 | 0.00 | 0.00 |
| MFR | Marketing Fund Reimb | 38.00 | 39.00 | -77.00 | 0.00 | 0.00 |
| RET | Real Estate Taxes | 284.00 | 292.00 | -576.00 | 0.00 | 0.00 |
| RNT | Base Rent | 47,015.09 | 5,469.04 | -3,792.75 | 0.00 | 48,691.38 |
| | **Total** | **48,533.09** | **6,986.04** | **-6,827.75** | **0.00** | **48,691.38** |
| **02/21** | | | | | | |
| CAM | Common Area Maintenance | 0.00 | 1,139.00 | 0.00 | 0.00 | 1,139.00 |
| INS | Insurance | 0.00 | 47.00 | 0.00 | 0.00 | 47.00 |
| MFR | Marketing Fund Reimb | 0.00 | 39.00 | 0.00 | 0.00 | 39.00 |
| RET | Real Estate Taxes | 0.00 | 292.00 | 0.00 | 0.00 | 292.00 |

EXHIBIT C

| Database: | WCRETAIL | Tenant Ledger Summary Report | | | Page: | 3 |
| | | | | | Date: | 5/14/2021 |
| Current Tenant | | Saigon Noodles | | | Time: | 7:10 PM |
| | | Transactions From  01/20 through  05/21 | | | | |

| Period Category | Description | Beginning Balance | Charges | Cash Received | Adjustments | Ending Balance |
|---|---|---|---|---|---|---|
| RNT | Base Rent | 48,691.38 | 5,633.11 | 0.00 | 0.00 | 54,324.49 |
| | **Total** | **48,691.38** | **7,150.11** | **0.00** | **0.00** | **55,841.49** |
| **03/21** | | | | | | |
| CAM | Common Area Maintenance | 1,139.00 | 1,139.00 | -2,278.00 | 0.00 | 0.00 |
| INS | Insurance | 47.00 | 47.00 | -94.00 | 0.00 | 0.00 |
| MFR | Marketing Fund Reimb | 39.00 | 39.00 | -78.00 | 0.00 | 0.00 |
| RET | Real Estate Taxes | 292.00 | 292.00 | -584.00 | 0.00 | 0.00 |
| RNT | Base Rent | 54,324.49 | 5,633.11 | -11,266.22 | 0.00 | 48,691.38 |
| | **Total** | **55,841.49** | **7,150.11** | **-14,300.22** | **0.00** | **48,691.38** |
| **04/21** | | | | | | |
| CAM | Common Area Maintenance | 0.00 | 1,139.00 | -1,139.00 | 0.00 | 0.00 |
| CAY | CAM-Prior Year | 0.00 | 562.91 | -562.91 | 0.00 | 0.00 |
| INS | Insurance | 0.00 | 47.00 | -47.00 | 0.00 | 0.00 |
| INY | Insurance-Prior Year | 0.00 | 93.47 | -93.47 | 0.00 | 0.00 |
| MFR | Marketing Fund Reimb | 0.00 | 39.00 | -39.00 | 0.00 | 0.00 |
| PPC | Prepaid CAM | 0.00 | 0.00 | -1,139.00 | 0.00 | -1,139.00 |
| PPI | Prepaid Insurance | 0.00 | 0.00 | -47.00 | 0.00 | -47.00 |
| PPM | Prepaid Marketing Income | 0.00 | 0.00 | -39.00 | 0.00 | -39.00 |
| PPR | Prepaid Rent | 0.00 | 0.00 | -5,633.11 | 0.00 | -5,633.11 |
| PRE | Prepaid Real Estate Tax | 0.00 | 0.00 | -292.00 | 0.00 | -292.00 |
| RET | Real Estate Taxes | 0.00 | 292.00 | -292.00 | 0.00 | 0.00 |
| REY | R/E Tax-Prior Year | 0.00 | 15.07 | -15.07 | 0.00 | 0.00 |
| RNT | Base Rent | 48,691.38 | 5,633.11 | -5,633.11 | 0.00 | 48,691.38 |
| | **Total** | **48,691.38** | **7,821.56** | **-14,971.67** | **0.00** | **41,541.27** |
| **05/21** | | | | | | |
| CAM | Common Area Maintenance | 0.00 | 1,139.00 | -1,139.00 | 0.00 | 0.00 |
| INS | Insurance | 0.00 | 47.00 | -47.00 | 0.00 | 0.00 |
| MFR | Marketing Fund Reimb | 0.00 | 39.00 | -39.00 | 0.00 | 0.00 |
| PPC | Prepaid CAM | -1,139.00 | 1,139.00 | 0.00 | 0.00 | 0.00 |
| PPI | Prepaid Insurance | -47.00 | 47.00 | 0.00 | 0.00 | 0.00 |
| PPM | Prepaid Marketing Income | -39.00 | 39.00 | 0.00 | 0.00 | 0.00 |
| PPR | Prepaid Rent | -5,633.11 | 5,633.11 | 0.00 | 0.00 | 0.00 |
| PRE | Prepaid Real Estate Tax | -292.00 | 292.00 | 0.00 | 0.00 | 0.00 |
| RET | Real Estate Taxes | 0.00 | 292.00 | -292.00 | 0.00 | 0.00 |
| RNT | Base Rent | 48,691.38 | 5,633.11 | -5,633.11 | 0.00 | 48,691.38 |
| | **Total** | **41,541.27** | **14,300.22** | **-7,150.11** | **0.00** | **48,691.38** |

EXHIBIT C

**PROOF OF SERVICE**

I, WENDY A. YONES, declare as follows:

I am employed in the County of San Diego, State of California; I am over the age of eighteen years and am not a party to this action; my business address is Solomon Ward Seidenwurm & Smith, LLP, 401 B Street, Suite 1200, San Diego, CA 92101, in said County and State. On May 25, 2021, I served the following document(s):

**OPPOSITION TO DEBTORS' EMERGENCY APPLICATION FOR AN ORDER ALLOWING DEBTORS TO CONTINUE OPERATING THEIR BUSINESS PENDING THE BAKNRUPTCY ADMINISTRATION; JOINDER IN TRUSTEE'S OPPOSTION; DECLARATION OF ROBERTA DEGENER**

on each of the interested parties as follows:

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>May 25, 2021</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

    Brian A. Kretsch    brikretsch@sbcglobal.net, r59194@notify.bestcase.com
    Ronald E. Stadtmueller    ecfstadt@aol.com, res@trustesolutions.net;
    ecfstadt2@aol.com
    United States Trustee    ustp.region15@usdoj.gov
    Daniel J. Winfree    lawyer@bkatty.com, admin@bkatty.com

**BY EMAIL:** This document was transmitted by email from wyones@swsslaw.com. The transmission was reported as complete and without error.

    **Daniel Winfree - lawyer@bkatty.com**

**SERVED BY U.S. MAIL:** On <u>May 25, 2021</u>, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  May 25, 2021        By: <u>/s/ Wendy A. Yones</u>
                              WENDY A. YONES